JUDAH M. STONE & others *vs.* RAIMOND MASSA & others.

Suffolk.    April 8, 1966. — June 30, 1966.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & SPIEGEL, JJ.

*Corporation,* Sale of business, Voting trust, Use of corporation funds. *Trust,* Voting trust. *Equity Pleading and Practice,* Costs.

In the circumstances, a vote by two of the three trustees of a voting trust of all the stock of a solvent corporation to sell all the corporation's assets for a certain sum "adjusted to reflect changes arising by reason of the regular operation of the business to the date of transfer," which would result in a substantial distribution to its stockholders, did not validate a sale and transfer of such assets to a second corporation some weeks later where it appeared that the second corporation had been recently formed by a large creditor of the first corporation who had backed it financially and desired to acquire its business, that he in effect dominated the decisions of such two trustees although the voting trust obligated them to "exercise their best judgment in the interests of" the first corporation, that the principal purpose of the sale was not to pay its debts to the creditor but to exclude from any benefit of the business certain stockholders of the first corporation, that a week after the vote a fire destroyed or damaged its premises and inventory, that nevertheless the creditor went ahead with his acquisition of the business and he and the two trustees used the balance sheet of the first corporation after the fire to determine the application of the vote respecting adjustment of the sum payable, and that such application resulted in no sum payable to the first corporation.   [275–278]

Where a sale of all the assets of a corporation to a second corporation formed by a creditor of the first corporation was held invalid by this court some years later but had been made in the belief that good title to such assets would pass under a certain vote requiring payment of a specified amount to the first corporation, which never was paid, and the second corporation had prospered as a result of efforts of its personnel since the sale, substantial justice required that the creditor be given an election to pay the specified amount, with interest from the date of the sale, to the first corporation, and to have the sale affirmed.   [278–279]

Findings in a suit in equity justified conclusions that a creditor of a corporation was not liable to it on account of an irregular arrangement whereby its debts to him were reduced through stock transactions by him in its name, and that the two chief officers of the corporation were not liable to it for money expended for automobiles used by each to a substantial extent on its business.   [279–281]

Order made by this court respecting payment of the reasonable fees and
expenses of certain attorneys in litigation arising from a vote by two
of three trustees of a voting trust of all the stock of a corporation lead-
ing to an invalid sale and transfer of all the corporate assets to another
corporation, and of a trustee of the trust appointed by a Probate Court
following removal of a trustee.   [282]

BILL IN EQUITY filed in the Supreme Judicial Court for the
county of Suffolk on November 12, 1963.

Upon transfer to the Superior Court the suit was heard
by *Sgarzi,* J., on a master's report.

*John D. Dwyer* for Raimond Massa & others.

*Edward H. Bennett, Jr.* (*Joseph H. Choate, III,* with
him) for Edward H. Bennett, Jr., trustee; *Robert K.
Lamere,* for Raimond, Inc., also with him.

*Bernard P. Rome* (*Oliver T. Cook* with him) for the
plaintiffs.

WHITTEMORE, J.   This proceeding under G. L. c. 231A
sought the determination of controversies between two
groups claiming rights in business assets which until Feb-
ruary 6, 1961, were owned by the defendant Raimond,
Incorporated (Raimond, Inc.).   On that date, by vote of
the plaintiffs Judah M. Stone and Leonard Florence, two
of three voting trustees of all the stock of Raimond,
Inc., the assets were transferred to the plaintiff Raimond
Silver Manufacturing Company, Inc. (Raimond Silver).
The third voting trustee, the defendant Raimond Massa
(Massa), did not join in the sale.   The defendant Edward
H. Bennett, Jr., is now a trustee of the voting trust in the
place of Judah Stone, whose removal as trustee by decree
of the Probate Court for Suffolk County was sustained by
this court in *Massa* v. *Stone,* 346 Mass. 67.   The fourth
plaintiff is Dewey D. Stone, who gave financial assistance
to Raimond, Inc. beginning prior to 1955.   The other two
defendants, Louis Massa and Joseph V. Massa, are sons of
Massa and stockholders of Raimond, Inc.   In *Bennett* v.
*Florence,* 347 Mass. 707, and *Bennett* v. *Superior Court,*
347 Mass. 783, we held in effect that the several controver-
sies should be resolved in the present suit.

The final decree, following confirmation of a master's report, declared the validity of the transfer of February 6, 1961. Other aspects of the decree are indicated in the course of this opinion. The defendants have appealed from the interlocutory decrees confirming the master's report and denying recommittal and from the final decree. They contend that the master's ultimate findings and conclusions cannot follow from his subsidiary findings. The master found the facts to be as stated below.

1. *The sale of February 6, 1961.*

In 1937 Massa, after being employed for some years as a silversmith, began, in his home, a small jewelry business. In 1940, with Louis Brown, a man with some business experience, he organized Raimond, Inc. Brown and Massa each held fifty of the one hundred shares of stock of the corporation. Until 1955 the chief business was the manufacture and sale of jewelry novelties and costume jewelry. In 1954 the corporation began to make and sell picture frames of sterling silver and other metals. Products were sold under the trade name Raimond and were well received. Sales were not large. Operations were generally unprofitable. On two occasions prior to 1955 Dewey Stone, a friend of Brown, had lent a total of $8,000 for brief periods. The loans were without interest and were repaid.

In the spring of 1955, at the solicitation of Brown, and with the consent of Massa, Dewey Stone agreed to lend Raimond, Inc. $25,000 provided that his nephew by marriage, Judah Stone, be employed to render administrative and legal services and be given one third of the stock and that all the stock be placed in a voting trust with Massa, Brown, and Judah Stone as trustees under which all decisions would be by a majority vote including the vote of Judah Stone. This proposal was carried out. By the spring of 1956 the corporation had shown no progress and Dewey Stone suggested to his young friend Leonard Florence the possibility of his employment by Raimond, Inc. After talking with Massa, Brown, and Judah Stone, Florence went to work for Raimond, Inc. in June, 1956, and was

given twenty-five per cent of the shares.[1]   A new voting
trust was set up with Massa, Judah Stone and Florence as
trustees.   The term, ten years, was to end June 18, 1966.
The provision for voting was the same as in the earlier
trust.   Florence became vice-president, assistant treasurer,
and general manager.   The directors then were Massa,
Judah Stone, and Florence.

Dewey Stone then brought new money into the business.
Sales and production increased.   Sales were made by Flor-
ence ("[a]ble and tireless and an excellent salesman") and
by commission salesmen.   Florence improved merchandis-
ing methods and hired a college friend to work on produc-
tion.   The three Massas continued to work on production.
Brown died on June 1, 1957.

Losses continued and were to amount to $38,000 by
July 31, 1957.   In the first week of April, 1957, the corpora-
tion needed money for its weekly payroll for its thirteen
employees.   Raimond, Inc. then owed Dewey Stone $35,000,
and owed $59,339.14 to Judah Stone for funds borrowed by
him for the corporation on notes guaranteed by Dewey
Stone.

A meeting at Dewey Stone's office on April 9 was at-
tended by the Stones, the Massas, Florence, and Mr. Arthur
T. Wasserman, Dewey Stone's attorney in his dealings with
the corporation.   Although the directors had not engaged
Mr. Wasserman, and Massa, the president, had not been
consulted, Mr. Wasserman introduced himself as, and acted
as, the attorney for the corporation.   As the sole source of
funds for a then insolvent enterprise, Dewey Stone re-
garded himself as entitled to direct its affairs.   He was
greatly irritated with the Massas because of salary in-
creases which Joseph and Louis Massa had requested and

---

[1] The 100 shares were redistributed as follows:

| | |
|---|---|
| Raimond Massa | 20 shares |
| Joseph Massa, his son | 5 shares |
| Louis Massa, another son | 5 shares |
| Judah Stone | 25 shares |
| Leonard Florence | 25 shares |
| Louis Brown | 20 shares. |

received since June, 1956. Dewey Stone told the Massas they were fired. He also said, contrary to the fact, that he had taken over the Brown stock and controlled seventy per cent of all the stock and that he was not going to divide his money with strangers. He demanded that the Massas either turn over their stock to Florence and Judah Stone or pay off the loans, at a $10,000 discount for a net of $80,000. As everyone present knew, the Massas had no significant funds. During the meeting Judah Stone and Florence "said practically nothing, acquiescing in all the statements of Dewey Stone." The Massas, Judah Stone, and Florence returned to the plant and, at Florence's orders, a locksmith changed all locks. From this point on the Massas were excluded from the business.

The episode on April 9, 1957, illustrated Dewey Stone's view that as he was the only one with funds at risk in the business he should control "fundamental management decisions and should determine how the company's funds should be used." He believed that the Massa investment had long since been lost and that Massa and his sons were entitled to only such benefits as Dewey Stone saw fit to accord them. By then he had concluded that he wanted them to have no further benefits. Florence and Judah Stone "acquiesced in Dewey Stone's view as to the control that he regarded himself as entitled to exercise."

Net profits from all activities for the fiscal year ending July 31, 1959, were $15,560. Florence was working indefatigably six and seven days a week in and out of the plant. More than half the sales were directly attributable to him. He had expanded the company's range of merchandise by buying items for resale. These jobbing sales were about half the company's business. The need for working capital increased. Dewey Stone remained the source of funds and direct and indirect assistance from him then totaled $177,693.36.

By the end of February, 1960, there was reason to believe the corporation could survive at least so long as Florence contributed his talents and Dewey Stone furnished financial

backing. There was reason to anticipate that there might soon be profits which Dewey Stone believed would be "attributable solely to his money and . . . Florence's talents, and he did not believe the Massas should enjoy their fruits." Hence in his view either Dewey Stone or the Massas would have to get out.

In February, 1960, Dewey Stone told Judah Stone and Florence of his desire to withdraw his backing if the Massas were to retain an interest. The two executives made some inquiries of others about possible refinancing, but elicited no interest. "Dewey Stone concluded that he was now inextricably involved with the corporation and that he could exclude the Massas only by acquiring all the assets as a going enterprise which could then be owned by himself alone."

Dewey Stone, embarking upon his plan to acquire the business, told Judah Stone and Florence of his decision. "Without attempting to negotiate or remonstrate and knowing that they would continue as chief executives of the business in Dewey Stone's hands, the latter two acquiesced in Dewey Stone's plan." After conferring with Mr. Wasserman, and without consulting any other counsel or obtaining any outside appraisal of the business, they made arrangements for a stockholders' meeting on April 7, 1960, at which they intended to accept a proposal from Dewey Stone to acquire the assets for a sum equal to the total liabilities. "It was plain however that if they refused Dewey Stone would not have forced a liquidation, since he would have suffered great financial loss."

Massa on April 6, 1960, brought a suit in the Superior Court to enjoin Judah Stone's voting the stock in the trust. As an alternative the suit sought removal of Judah Stone as trustee. A preliminary injunction issued and the meeting was not held.

On April 16, 1960, Dewey Stone delivered a letter of that date to Raimond, Inc., attention of Florence, in which he stated that he was unwilling to continue to finance the corporation and was "insistent that the company, at its op-

tion," either forthwith pay amounts owing to him and to Judah Stone and obtain the release of his guaranties and of the pledges of his property or have the corporation transfer to him or a new corporation all its assets for a sum equal to their book value as shown on the February 29, 1960, balance sheet "adjusted to reflect changes arising by reason of the regular operation of the business to the date of transfer." Payment would be made by assuming and paying all liabilities and, if on the date of closing the assets should exceed the liabilities, the excess would be paid in cash to the corporation. If the second option were adopted he would additionally release Judah Stone, Massa, and Florence as indorsers on the corporation's notes to Judah Stone (total $59,339.14).

At a directors' meeting on April 21, 1960 (Massa attended accompanied by counsel), it was suggested that Massa try to find a purchaser and he was given revocable authority to sell the business for $275,000 cash, and was to report on May 5, 1960. A vote was passed over his objection accepting Dewey Stone's second option but providing that stockholder approval would not be sought for two weeks.

On May 5, 1960, Massa not attending, his authority to find a purchaser was revoked, and the meeting was adjourned to May 13, but did not reconvene on that date.

The condition of the business was such that replacement of the money that Dewey Stone had made available was commercially impracticable without a guarantor of comparable financial strength. The business was not readily saleable.

As July 31, 1960, approached, it became plain that the corporation for the year then ending would show a substantial profit.[2] The capital deficit was about to be overcome and a tax loss carry-over of $49,991 was about to become almost fully absorbed. To meet the prospect of a Federal

---

[2] Comparable sales: 1958, $155,500; 1959, $249,300; 1960, $433,600. Comparable profits: 1958 ($13,800) (loss); 1959, $15,560 (including $6,790 gain on Dewey Stone's "Brockton stock" transactions for the account of the corporation); 1960, $47,200.

income tax in the following year, Judah Stone and Florence, on direction from Dewey Stone, on July 26, 1960, at a meeting of directors not attended by Massa, voted to place on the books liabilities to Dewey Stone in the amount of $62,400. Included were items for interest on direct loans, and compensation for use of collateral, for guaranty of credit and for services as financial adviser. These accruals, the master concluded, were invalid, not having been put on the books in the respective years for which they were now accrued. Also at that time there was placed on the books an item of accrued salary to Florence of $9,232, also invalid in the master's view.

In December, 1960, Massa's suit was heard in the Superior Court, following a special master's report on the financial condition of Raimond, Inc. The central issue tried was the propriety of the proposed transfer to Dewey Stone under the April 16, 1960, offer. The items accrued on the books in July were not mentioned and were not in issue. In reply to a specific question by the judge as to the amount of the corporation's direct liabilities to him, Dewey Stone, speaking through his counsel, made no mention of the July 26, 1960, accruals, then on the books, and did not include them in the total. The judge dismissed the suit, saying that he found no violation by Judah Stone of his duties as trustee and that the Brockton stock transactions, dealt with below, were a good deal for the corporation as under it Dewey Stone absorbed losses and the corporation had the profits. As to Massa's claim that the corporation's stock was worth $50,000 to $60,000, the judge expressed the view that the balance sheets (showing losses for five years and the only gain, except in the last year, a gain made on investments) were such that it would take some time for the corporation, even with continuing gains, to be in a position to attract money of banks or other lenders to continue the business. On January 11, 1961, a single justice of this court denied a petition for stay of the final decree pending appeal.

In the meantime notice had been sent to the three voting trustees of a stockholder's meeting for December 29, 1960,

to act upon a plan for the sale of all the assets of the corporation for a sum equal to total liabilities as of April 30, 1960, adjusted for operations to the date of sale. Massa received the notice and did not attend. On December 29 the meeting was adjourned to January 11, 1961. On that day, following the court proceedings, Judah Stone and Florence (Massa not being present) voted to transfer the assets to Dewey Stone in accordance with the latter's letter of April 16, 1960. On that date the net worth (excess of book assets over liabilities excluding invalid accruals) was $22,000. This was due in part at least to additional financial support by Dewey Stone in October, 1960. When voting for the sale both Judah Stone and Florence knew that Dewey Stone intended to continue the business in a new Massachusetts corporation, Raimond Silver, of which Judah Stone and Florence would be the chief executive officers. Raimond Silver had been organized in Mr. Wasserman's office on December 29, 1960.

The vote on January 11, 1961, was in accordance with the notice, and at the conclusion of the meeting Mr. Wasserman began to prepare the minutes and to draw various instruments.

On January 18, 1961, before the minutes of the meeting and the transfer papers had been prepared, a devastating fire destroyed the company's premises. Inventory, raw and finished, was destroyed or badly damaged. The insurance companies treated it as a total loss ($175,000). The corporation's insurance, however, was only $89,000. The uncompensated loss was $86,000 but by reworking and repairing damaged items this was reduced to $25,000. Incidental expenses increased this to $30,000.

Despite the destruction Dewey Stone decided to go ahead with his acquisition. "Any debts which he was not already obliged to pay were minor and unimportant." He realized that only by a revival of the business could he expect to salvage his investment. To have done nothing would have resulted in a liquidation at such a great loss that he would have had to pay substantial deficiencies. He gave Mr.

Wasserman instructions to take the necessary legal steps to complete the transaction. There was prepared for Dewey Stone's signature, and he signed, a letter to Raimond, Inc. predated to December 21, 1960, the day after the decision in the Superior Court. That letter in terms withdrew the offer of April, 1960, and substituted an offer in substantially the same terms except that it excluded from the liabilities the accruals of July 26, 1960. The assets and liabilities of April 30, 1960, were, as before, to be "adjusted to reflect changes arising by reason of the regular operation of the business to the date of transfer."

The minutes of the January 11, 1961, meeting, attested by Judah Stone as a true record, purported to accept the terms of the predated letter and to authorize the necessary instruments. The vote recorded differed from the vote adopted in that the recorded vote excluded the accruals to Dewey Stone and Florence. The master concluded that, as "the accruals were invalid . . . the exclusion was immaterial."

The transfer was completed on February 6, 1961. The balance sheet of that date showed a deficit in net worth of $90,860.31. The master found, however, that this included invalid accruals totaling $78,147.80, that it overstated the direct debt to Dewey Stone by $9,297.39 and that it included the claim of a public adjuster for $8,900 later settled for $4,450. The total of the adjustments, apart from the reduction in the adjuster's claim, was $87,445.19.

The master, with full consideration of relevant factors, determined that the net worth on January 11, 1961, was between $35,000 and $50,000; also that in view of "the imprecision of a valuation of a closely held small business . . ." Dewey Stone's price of $22,000 was reasonably close to the range indicated and was therefore a reasonable figure. He found that the whole purpose of the hearing in the Superior Court had been to determine whether the sale should be allowed to take place and whether the trustees acted properly in proceeding with the sale after the decision. The same claims of conflict of interest were con-

sidered by the Superior Court judge. "At the trial . . . substantially the same evidence was introduced as in the hearing before . . . [the master] relative to Dewey Stone's desire to exclude the Massas and the expectation of both Judah Stone and . . . Florence that they would be the chief executives of the new company."

The master concluded further that the fairness of the sale should be determined by conditions after the fire. He found that "after the fire Dewey Stone could have elected to refuse to complete the purchase. Nevertheless he decided to go through with it, using the February 6, 1961 balance sheet . . . as the final statement of the company's condition to determine the application of his predated letter." At that time no outsider would have considered a purchase and the fair market value of the business was zero. In purchasing, Dewey Stone, as Florence and Judah Stone knew, was determined to exclude the Massas from any interest "[y]et in the light of . . . [the Superior Court] decision on which . . . [they] both rely and in the circumstances following the fire, the completion of the transfer was not . . . improper."

On February 6, 1961, Raimond, Inc. transferred to Raimond Silver all its assets including the name Raimond and the good will. There was no net payment to Raimond, Inc. The new company and Dewey Stone each assumed payment of specified liabilities totaling $178,600, representing all the debts of the company other than the direct debt to Dewey Stone.

Raimond Silver was capitalized by issuance to Dewey Stone of (a) 8% ten year debentures for $59,441 (treated as cost of inventory, and representing the amount of the direct debt to Dewey Stone) and (b) 1,000 shares of common stock. Dewey Stone as sole stockholder elected as directors himself, Mr. Wasserman, Florence, Judah Stone, and Melvin Levine who had succeeded Massa as a director of Raimond, Inc. on November 9, 1960. In December, 1961, Dewey Stone transferred without consideration 150 shares of stock to each of Florence, Judah Stone and Mr. Wasser-

man. In September, 1962, the stock was reclassified into
Class A and Class B common stock. The Class A stock
had voting power but no right to dividends. The Class B
stock was nonvoting but entitled to dividends. Both classes
share equally on liquidation. The stock was redistributed
as follows: Class A, Dewey Stone, 51%; Florence, 49%.
Class B: "among Judah Stone, . . . Florence, . . . Levine
and two children of Mr. Wasserman." The business has
been restored and has grown. For the year ending July 31,
1964, the sales were nearly $1,000,000. The name Raimond
is featured. The line of products has been expanded but
sterling silver picture frames continue to be an important
and featured part of the business. "In a very real sense
. . . the new business is an expanded continuation of the
old one."

Since the transfer of February 6, 1961, the Dewey Stone
direct loans and the Judah Stone loans "have remained at
their former levels." A substantial indebtedness to the
Malden Trust Company (after being reduced to zero in
May, 1961) has been reëstablished.

We consider first the action on January 11, 1961. Two
questions are involved: (1) Was there a valid decision to
make the sale? (2) If there was a valid decision to sell,
was the consideration reasonable? The master's report
supports an affirmative answer to the second question.
We turn therefore to the issue of the propriety, in the
circumstances, of the vote to sell all the assets to a new
corporation.

In sustaining the decree of the Probate Court of Novem-
ber 2, 1961, removing Judah Stone as trustee (346 Mass. 67,
74–75), this court assumed that Judah Stone had been ap-
pointed to conserve the interests of Dewey Stone as a credi-
tor and that he could vote in a manner tending to guard
those interests fairly if he acted "without improper fur-
therance of the trustee's or the creditor's interests to the
detriment of those of the corporation and the beneficiaries."

The plaintiffs earnestly contend that Dewey Stone's posi-
tion was only that of creditor of an insolvent corporation,

that as such he had a right to demand payment, and that it was their right, and indeed their duty, to pay the creditor in the only way possible. The facts found do not support the argument. On January 11, 1961, Raimond, Inc. was not insolvent, even on book figures, excluding the invalid accruals. The sale was not primarily to meet a creditor's demand for payment, and, at least in the matter of excluding other stockholders, Dewey Stone's relationship to the corporation was more than creditor. From 1957 he had asserted control of "fundamental management decisions" and the two executives had acquiesced. We conclude that, by the time of the vote, their decisions as voting trustees were, in effect, made by him.

The sale was not for the purpose of paying Dewey Stone's loans. With the Massas eliminated, the loans have continued. The sale was not to avoid a liquidation which the creditor undoubtedly could have forced with entire legality. The finding is that liquidation would have meant great financial loss and that Dewey Stone would not have forced it. The master's report makes it plain that the principal purpose of the sale was to exclude the Massas from any benefit of the business, now that through the efforts and investment of others it stood on the threshold of profits and success.

We think the sale could not be justified on the ground that, if this proposal did not go through, there might have been other ways, such as a receivership by which, with propriety, Dewey Stone's creditor power might have been exercised to end Raimond, Inc. and, nevertheless, to preserve to him as a purchaser the value of the going business. The issue is only the validity of the use of the voting trust power as it was in fact used.

We assume that the voting trustees, possessing "all stockholders' rights of every kind," had the power to sell the corporate assets. *Bullivant* v. *First Natl. Bank,* 246 Mass. 324, 333–334. But they "could not use . . . power under that agreement for the furtherance of . . . [their] own interests to the detriment of others." *Ibid.*

*Massa* v. *Stone,* 346 Mass. 67, 74. In the circumstances, this principle applied not only to the furtherance of their own interests but also to the furtherance of the interests of Dewey Stone who dominated their acts.

The voting trust agreement stated the obligation of the trustees in any act or vote to "exercise their best judgment in the interests of . . . Raimond . . . [Inc.] to the end that its affairs shall be properly managed." The position of the two acting trustees was such, both because of personal interest and because of Dewey Stone's control, that they were unable to "exercise their best judgment" in deciding whether the sale, although primarily to exclude the Massas from future profits, was nevertheless "in the interests of . . . Raimond . . . [Inc.]" because of the uncertainty as to whether and how long Dewey Stone's intention to go on with the business would continue. We assume that an arm's length transaction was not required. But to cast the votes of all the stockholders the trustees had to be in a position to weigh fairly those points that would have been relevant to a sale of minority shares. Neither Judah Stone nor Florence was in a position to do this. Dewey Stone's position as creditor did not justify his exercise of control of a majority of the voting trustees to accomplish a sale, not primarily intended to pay the debts owed to him, without regard to whatever interests the Massas still retained through their stock.

The plaintiffs, however, as did the master, rely on the dismissal in the Superior Court of a suit the purpose of which was to determine if the sale should be allowed to take place. The defendants, on the other hand, point out that the decree was not res adjudicata as to Massa's sons. They suggest that, had the ambiguous and invalid entries of July 26, 1960, been disclosed to the judge, the underlying issue of the propriety of any sale might have appeared in a different aspect, and a different decision might have been entered.

For a transfer taking place under and in accordance with the vote of January 11, 1961, the plaintiffs' argument car-

ries weight.  Even if some important aspect of the facts
did not appear in the evidence, the Superior Court proceed-
ings had given the opportunity for full, impartial consider-
ation whether the sale as proposed in the letter of April 16,
1960, would be ''in the interests of . . . Raimond . . .
[Inc.].''

We hold, however, that the transfer was not under and in
accordance with the vote of January 11.  The fire of Janu-
ary 18, as the master found, and as the plaintiffs emphasize
in their brief, destroyed, in effect, the subject matter of the
vote of January 11.  In the light of all the circumstances
we do not regard this as a change ''arising by reason of the
regular operation of the business,'' within the meaning of
the proposal and the vote.  The newly presented issue was
what action should be taken on the greatly changed facts.
What Dewey Stone and the two trustees decided to do was
to go through with the sale ''using the February 6, 1961
balance sheet . . . [the balance sheet after the fire] as the
final statement to determine the application of . . . [Dewey
Stone's] predated letter.''  This was a new corporate de-
cision, in respect of which no notice had been given to stock-
holders and no vote had been taken.  The vote of Janu-
ary 11, 1961, could not support a sale on the February 6,
1961, balance sheet.  That vote, as we construe it, calls for
the payment to the corporation of $22,000 adjusted to re-
flect the regular course of business through January 17.
Practically, we assume the six days may be disregarded.
We reject the contention that the recording of the vote as
accepting the offer in the predated letter invalidated the
vote.  The change in the offer, by elimination of the accru-
als, was of course favorable to the stockholders; it was re-
quired if the transaction was to be the transaction presented
to the judge in the Superior Court, and, indeed, was im-
plicit in the statement of counsel, in the court room, ex-
cluding the accruals from the indebtedness claimed by
Dewey Stone.

We turn to the issue of what relief is just.  Inasmuch as
there was no valid sale, the fairness of the transaction of

February 6, 1961, is relevant only to that issue. We are
not impressed with the contention that since the Superior
Court judge deemed the January 11 sale fair, and the acting
trustees had a basis for their vote of that date, the Feb-
ruary 6 sale under the same formula should be deemed fair.
The January 11 vote called for the sale of a going business
for $22,000 and hence for a substantial distribution to
stockholders. There was no consideration by any impartial
person of the fairness of ending the Massas' stock interest
with no payment to them at a time when because of the fire
and inadequate insurance[3] the sale value of the business
was nil, and at a time when the financial backer was firmly
committed to action to overcome the losses and to restore
the business and when, by the application of the available
management skills, restoration was in reasonable prospect.

Dewey Stone, because of the fire, could have declined to
go through with the January 11, 1961, transaction, or he
could have elected to pay the consideration due. He did
neither. The assumptions of those acting (1) that the
creditor, without the intention to take creditor action, could,
through control of the voting trust, have the result of credi-
tor action, and (2) that the vote applied to the assets after
the fire were mistaken and led to litigation and expense.
We are not persuaded however that justice requires that
the sale must be set aside. We assume that it was made in
the belief that good title to the assets would pass under the
vote of January 11. The present assets of Raimond Silver
are of course in very great part the result of efforts since
February 6, 1961.

In the circumstances we think that substantial justice will
be done if Dewey Stone is now given an election to pay the
amount due under the vote of January 11 upon the basis set
forth below and to have the sale affirmed rather than to
have it set aside.

2. *The Brockton stock transactions.*

In January, 1958, Dewey Stone devised a "highly unusual
arrangement" to apply the corporation's "tax loss carry-

---

[3] Whether those managing the business could have obtained more insurance
does not appear.

forward" against possible gains from his speculation in securities and then to use anticipated tax free gains to reduce direct and indirect debts from Raimond, Inc. to him. "The origin and handling of the Brockton stock [transactions] were marked by great casualness, once again indicative of Dewey Stone's view, in which Judah Stone and . . . Florence acquiesced, that his financing of the company entitled him to full control over its affairs." Dewey Stone told Judah Stone and Florence about the arrangement and said that the profits would accrue to the corporation and he would bear the losses. The three contemplated a short term operation for such period as Dewey Stone might determine and that at the end of the period Dewey Stone would pay the corporation the amount of any net loss while net profits would "automatically be the property of the corporation."

We deem it unnecessary to set out the details of the scheme. We agree with the master that, in the circumstances, Dewey Stone is not indebted to the corporation on account of these irregular transactions. In view of the outcome, and the arrangement under which Raimond, Inc. could not lose, and might gain, Dewey Stone should not be held to account as a trustee for profits made in the sale of certain securities without regard to the losses in others. The corporation was not legally bound to anyone. The unauthorized use of its name appears not to have made it liable for losses. Very careful scrutiny of what was done was of course required. That has now been had. The subsidiary facts justify the conclusion embodied in the final decree that Dewey Stone is not liable to Raimond, Inc. on account of these transactions.

3. *Automobile purchases.*

The Massas contend that Judah Stone and Florence are indebted to the corporation for money expended for automobiles used by each. On June 15, 1956, when the corporation owned no vehicles, the directors voted that "the corporate officers will make available their personal vehicles for corporate use, at no expense to the corporation." This

enabled Judah Stone and Florence to claim as deductible expenses on their personal income tax returns amounts expended for the use of their automobiles in company business.

In 1958 or 1959 the company purchased at a cost of $5,900 two passenger automobiles and made one available to Florence and the other to Judah Stone. No vote was adopted and the vote of June 15, 1956, was not changed. Each used the automobile to a substantial extent on corporation business. The master found no conflict between the vote of June 15, 1956, and the later purchase of the two vehicles. On the subsidiary findings we cannot say that this conclusion was unjustified. There was no error in the decree in this regard.

4. *Conclusion.*

(1) The exceptions to the master's report, in so far as they put in issue the conclusion that the transfer of February 6, 1961, was valid, are sustained. The interlocutory and final decrees are reversed, and an interlocutory decree is to enter in the Superior Court confirming the master's report as modified by sustaining the exceptions.

(2) A decree shall enter continuing the trustees of the voting trust as trustees of the stock of Raimond, Inc. until, by further order, the Superior Court shall determine that the continuance of the trust will no longer serve the ends herein provided for.

(3) If within sixty days of rescript Dewey Stone shall by stipulation elect to proceed under the vote of January 11, 1961, an interlocutory decree shall enter ordering Dewey Stone to pay to Raimond, Inc. $22,000 with interest from February 6, 1961, and upon payment of that sum and of the payments required by paragraph (5) below, a final decree shall be entered confirming the sale of February 6, 1961.

(4) If an election is not made in accordance with paragraph (3) within sixty days of the rescript a decree shall enter setting aside the sale, appointing a receiver for Raimond, Inc., and referring to a master the formulation of an

appropriate plan for reconveyance of assets with adequate provision for creditors of Raimond Silver. The issue reserved by the master of the accountability of the individual plaintiffs for alleged excessive allowances to them by Raimond Silver is to be determined if the sale is set aside.

(5) There shall be paid by Raimond Silver or, if the assets are reconveyed under paragraph (4), by Raimond, Inc., the reasonable fees and expenses in this suit, in the case for removal of Judah Stone as trustee (346 Mass. 67), and in *Bennett* v. *Florence* (347 Mass. 707) of (a) the attorneys for the Massas and for Raimond, Inc. and (b) of the court appointed trustee. See *Commissioner of Ins.* v. *Massachusetts Acc. Co.* 318 Mass. 238, 242–243; *Miller* v. *Stern,* 326 Mass. 296, 304. The amounts of such payments shall be determined in the Superior Court.

(6) An appropriate decree shall reserve to the Massas whatever rights they may have to recover in an action pending in the Superior Court damages occasioned by their dismissal in April, 1957, since the master has stated that the issues in that action were not litigated before him.

(7) The new final decree shall incorporate the substance of paragraph 4 (Brockton stock transactions) and paragraph 5 (payments by Raimond, Inc. to Judah Stone and Leonard Florence) of the original final decree. Subject to the provisions of paragraphs (4) and (6), the final decree shall contain the substance of the injunctive relief of paragraph 7 of the original decree against further litigation based on matters contained in or arising out of the bill in equity for declaratory relief.

(8) The Superior Court may in its discretion take other appropriate action not inconsistent with the express provisions hereof, including provisions for representation of the interests adversary to the Massas in the action referred to in paragraph (6).

(9) The defendants are to have costs of this appeal.

*So ordered.*