CHELSEA INDUSTRIES, INC. *vs.* LEONARD FLORENCE.

Suffolk.    May 5, 1970. — June 30, 1970.

Present: WILKINS, C.J., CUTTER, KIRK, & QUIRICO, JJ.

*Contract*, Agreement not to compete, What constitutes, Contract of employment.

With respect to two contracts executed as part of a single transaction and closely interrelated, one a stock purchase contract between a holding company as purchaser and all the stockholders of a manufacturing company, and the other an employment contract between the manufacturing company and its general manager, who was a substantial stockholder in it at the time of the purchase contract and had greatly expanded its business, where it appeared that both contracts contained covenants by the manager not to compete with the manufacturing company after termination of his employment, and that the employment contract, with more specific terms, contained an exculpatory provision, not contained in the purchase contract, that in the event the employment contract should be prematurely terminated by the manufacturing company "for any reason other than . . . cause which is substantial and material" the noncompetition covenant of the employment contract should become "null and void," it was held that the noncompetition covenant of the purchase contract was controlled by the exculpatory provision of the employment contract. [55–56]

Evidence reported and facts found by the trial judge in a suit in equity disclosed that he was not plainly wrong in concluding that none of the reasons which he found were back of a discharge by a manufacturing company of its general manager constituted "substantial and material cause" for premature termination of his employment contract within a provision thereof that a noncompetition covenant therein should become void upon such a termination "for any reason other than . . . cause which is substantial and material" [56–57]; nor did the evidence respecting certain statements by the manager and a misunderstanding over a bonus warrant a conclusion that the company had "substantial and material cause" to terminate the contract for reasons other than those found by the judge [59].

A holding company which owned all the stock of a manufacturing company, and whose president and board chairman, and executive vice-president and treasurer, acting as two of three directors of the manu-

facturing company, voted to discharge the general manager thereof, was in substance responsible for the discharge, and, where it appeared in a suit in equity that the manufacturing company was barred from enforcing against the manager a covenant against competition because termination of his employment contract by it had not been for "substantial and material cause," it was held that the holding company also was not entitled to enforce such covenant, even though the holding company was a separate corporate entity from the manufacturing company. [60]

BILL IN EQUITY filed in the Superior Court on May 27 1969.

The suit was heard by *Mitchell,* J.

*Nathan T. Wolk* for the plaintiff.

*William E. Searson, III,* for the defendant.

CUTTER, J. Chelsea Industries, Inc. (Chelsea), seeks by this bill to enjoin Florence from competing with Raimond Silver Manufacturing Company, Inc. (Raimond),[1] which is wholly owned by Chelsea. The question arises under a written contract (the purchase contract), dated May 9, 1968, to which the parties were Chelsea, Florence, and other vendors of Raimond stock. By final decree, the bill was dismissed. Chelsea appealed. There is a report of material facts. The evidence is reported.

Raimond is an "item house" selling metal and glass items to some 12,000 buyers for stores and others. There are only three or four such item houses in the United States. When Florence joined Raimond's predecessor corporation as manager and chief executive officer in 1956, it had a narrow product line and a small annual sales volume ($53,000). It was losing money. Florence greatly expanded the business. In 1968, Raimond sold over 750 items, and had gross sales of over $5,600,000, and a net income of $385,000 after taxes. Florence had been given stock in the company. By 1967, he had a salary of $52,000 plus a bonus of $20,000. In 1967, partly at least because of the wishes of Raimond's financial

---

[1] For earlier cases dealing with Raimond, or a predecessor or related company, see *Massa* v. *Stone,* 346 Mass. 67, *Bennett* v. *Florence,* 347 Mass. 707, and *Stone* v. *Massa,* 351 Mass. 264. See also *Bennett* v. *Superior Court,* 347 Mass. 783.

backer, it was decided that Raimond should be sold. In August, 1967, Florence took steps to get the business appraised, but he was opposed to the terms of a proposed sale to Chelsea.

The purchase contract provided that Chelsea would buy all Raimond's shares from its stockholders. Chelsea paid $948,830.60 in cash (the fixed price), undertook to pay the lesser of $1,100,000 or 30% of Raimond's net profits over a seven-year period ending December 31, 1974 (the contingent price), and paid about $385,000 to retire Raimond's debts outstanding in 1968. Florence received $407,753 for his stock and was to receive $42\frac{1}{2}\%$ of the contingent price up to $1,000,000 and 85% of the balance.

The purchase contract provided that, simultaneously with the closing, Chelsea would cause Raimond to sign employment contracts with Florence and one Levine in forms set forth in attached schedules. Raimond and Florence did sign such a contract (the employment contract). Both the purchase contract and the employment contract contained covenants (described below) that bound Florence not to compete with Raimond for specified periods. These covenants differ somewhat from one another (fn. 5).

Section 8.07 of the purchase contract reads in part as follows: "Each Seller agrees (severally . . . ) that he will not, for the period during which . . . [Chelsea] shall be obligated to make any contingency payments . . . and for two years thereafter . . . engage directly or indirectly . . . or participate in the ownership . . . operation or control, or have any interest . . . in any organization . . . or business engaged substantially in competition with the business now . . . conducted by Raimond; provided, however, . . . [proviso not relevant]."[2]

---

[2] In § 8.07 each "Seller acknowledges that the remedy at law for any breach . . . of the . . . covenants will be wholly inadequate, and that . . . [Chelsea] shall . . . be entitled to injunctive relief" and that, as to "breaches . . . already consummated" Chelsea shall have an accounting and specified liquidated damages. The remedies under § 8.07 are described as "severable from" one another and as "intended to be in addition to . . . any other . . . remedies available to" Chelsea.

The employment contract provides in part in § 7 (emphasis supplied): "Florence agrees that during the term of this Agreement or any extension thereof and for two . . . years thereafter . . . he will not engage, directly or indirectly . . . or participate in the ownership . . . operation or control, or have any interest . . . in any organization . . . *engaged in substantial competition with the business now or hereafter operated . . . by . . .* [Raimond] provided" (proviso not relevant).[3] A closely related provision (§ 4 of the employment contract) reads: "Florence shall devote . . . his full time to advance the interests of . . . [Raimond], and he shall not directly or indirectly . . . be engaged in . . . any other compan[ies] . . . in the same line of business . . . unless with the written permission" of Raimond. "In the event this contract is terminated by . . . [Raimond] prior to any of the dates set forth in . . . [§ 1][4] for any reason *other than* the illness of Florence *or for cause which is substantial and material,* . . . [Raimond] agrees that the provisions of . . . [§ 7] shall be null and void" (emphasis supplied).

Section 8.07 of the purchase contract is not in terms subject to any such provision (hereafter called the exculpatory provision, see § 4) as affects § 7 of the employment contract and prevents the use of § 7 if the employment contract is

[3] Section 7 also provides: "Florence agrees that any breach of the restrictive covenant set forth above will result in irreparable damage to . . . [Raimond], for which it will have no adequate remedy at law, and Florence consents to an injunction . . . [against] any breach of all such covenants."

[4] The dates referred to are those set out in § 1 of the employment contract (quoted in part above) employing Florence as Raimond's general manager, "for a term commencing January 2nd, 1968 and ending on the first to occur of the following two dates: (a) December 31, 1974 or (b) The date on which . . . [Chelsea] under . . . [the purchase contract] shall have no further obligation to make any payments . . . on account of the Contingent Price. . . . Florence shall perform such duties and shall have such authority and powers as were previously enjoyed . . . or performed by him for . . . [Raimond] prior to . . . this Agreement. . . . [H]e shall perform such other duties that the . . . Directors . . . may reasonably require. . . . Florence is to be accountable for his instructions and his performance only to David Casty, Chairman of the Board . . . , or Norman Dunn, a Vice President . . . or their successors . . . Subject to the . . . foregoing sentences . . . Florence is hereby given . . . complete authority to administer the general operations of . . . [Raimond] including but not limited to hiring and firing of employees . . . ."

terminated "for any reason other than" Florence's illness "or for cause which is substantial and material." Chelsea contends that this exculpatory provision does not apply to § 8.07 of the purchase contract whereas Florence contends that it does apply.[5]

Florence worked under the employment contract for about nine months. He was discharged by the three-man board of directors of Raimond on February 24, 1969. David Casty and Norman Dunn voted for the action and Florence voted against it.

The trial judge concluded: (1) As to Florence, the provisions (concerning competition) in the purchase contract and those in the employment contract "were intended by the parties . . . to be binding as one agreement." (2) It also "was intended that the exculpatory provision . . . would apply equally to the non-competition provisions of the . . . [purchase contract] and the employment" contract. (3) "Florence in no way" violated "his employment contract" and he was discharged "without substantial and material cause."

Shortly after his discharge, Florence formed Leonard Silver Manufacturing Company, Inc. (Leonard). Florence in his answer admitted, as did his counsel at trial, that Leonard is in competition with Raimond.

1. Unless the exculpatory provision of the employment contract (§ 4) also applies to § 8.07 of the purchase contract, Florence's activities for Leonard constitute a violation of § 8.07. That section prohibits Florence from engaging "directly or indirectly . . . in any . . . business . . . substantially in competition with the business . . . conducted

---

[5] Further differences between § 8.07 of the purchase contract and § 7 of the employment contract are as follows: (1) Section 7 continues in effect "during the term of this Agreement or any extension thereof and for two . . . years thereafter." Section 8.07 runs for the period during which Chelsea "shall be obligated to make any contingency payments to Sellers, and for two years thereafter." These two periods could differ. (2) The prohibition against competition in § 7 ("engaged in substantial competition with the business now or hereafter operated . . . by" Raimond, "its subsidiaries or affiliates") differs from that in § 8.07 ("engaged substantially in competition with the business now operated and conducted by Raimond"). (3) Section 8.07 spells out various provisions for damages, whereas § 7 does not do so.

by Raimond." Under § 8.07, to commit a violation, Florence
need be only substantially in a competing business.[6]

2. The two contracts were part of a single transaction.
In construing them, weight must be given to that circum-
stance. See *Lamson & Co. (Inc.)* v. *Abrams*, 305 Mass. 238,
240. See also *Stern* v. *Stern*, 330 Mass. 312, 316–317;
*Bono* v. *Kramer*, 346 Mass. 355, 359–360. To be sure, the
parties to the two contracts were not the same. Florence
was one of six persons selling Raimond shares to Chelsea
under the purchase contract. His employment contract was
with Raimond only.

The contracts, however, were closely interrelated. The
employment contract was contemplated by the purchase
contract (§ 6.05). Florence's term of employment (see fn. 4)
was tied to a provision of the purchase contract. Section 9
of the employment contract stated that it "and any written
agreements entered into at the same date constitute the
entire contract between the parties."[7] Chelsea, in connec-
tion with the employment contract, gave Florence an option
to buy shares of Chelsea and guaranteed to "Florence dur-
ing such . . . time as Raimond . . . is a wholly owned
subsidiary of Chelsea" the payment of all sums to be paid
to him under the employment contract.

Although § 8.07 of the purchase contract makes no refer-
ence to § 7 of the employment contract, the two provisions
deal in very similar, but not precisely the same, manner
with the same subject matter. Sections 7 and 4 seem to be
the more specific. We think that these provisions should be
taken as controlling. We infer that, for Florence, the em-
ployment contract was a major inducement for his entering

---

[6] Section 7 of the employment contract (see fn. 5 [2]) seems to require
"substantial competition" before there is any violation. The trial judge
determined that when the suit "was commenced, Florence was engaged in a
business that competes with a business of . . . [Raimond] although at that
time the competition . . . was not substantial in relation to . . . [Raimond's]
business."

[7] A somewhat comparable provision (§ 8.05) of the purchase contract
refers to "written agreements entered into simultaneously herewith between
. . . [Chelsea which, as guarantor, at least, was a party to the employment
contract] and any other parties signing this Agreement."

into the purchase contract at all. We are not persuaded that each of these provisions was to operate independently of the other, or that each had any significant separate business purpose. Indeed, it would render illusory the protection given to Florence by §§ 4 and 7 of the employment contract, to hold (as Chelsea suggests) that he, even if discharged without substantial and material cause, remains subject to § 8.07 of the purchase contract. On such an interpretation, Chelsea for any reason could cause Raimond, its wholly owned subsidiary, to discharge Florence without risk (because of the existence of § 8.07) that he would be able to compete against Raimond. This interpretation would render the exculpatory provision largely without meaning. See *Berger* v. *Siegel*, 329 Mass. 74, 77–78. We hold that § 8.07 of the purchase agreement is controlled by the exculpatory provision.[8] Even under our holding, Chelsea could have protected its investment in Raimond (and its purchase of Raimond's good will) against competition from Florence by seeing that Raimond, its wholly owned subsidiary (see *My Bread Baking Co.* v. *Cumberland Farms, Inc.* 353 Mass. 614, 619), did not discharge Florence without substantial cause. In fact it was Chelsea's president and board chairman (David Casty) and Chelsea's executive vice-president and treasurer (Norman Dunn), acting as two of three directors of Raimond, who on February 24, 1969, voted to discharge Florence.

3. The trial judge found four reasons for Florence's discharge: (1) He had indicated that he would leave Raimond after all the contingency payments had been made to him.

_____

[8] Chelsea under § 3.02 of the purchase contract could sell its Raimond stock. The purchase contract contained no provision (as did some other instruments) that the contract was for the benefit of successors and assigns. Chelsea suggests that the benefit of § 8.07 might not pass to a purchaser from it of Raimond's stock and that this was a reason for the noncompetition provision in each contract. A purchaser of Raimond's shares, of course, would receive (through Raimond) indirect protection (against competition by Florence) of § 7 of the employment contract, as would Chelsea while it retained the stock. If the parties to the purchase contract desired to have § 8.07 entirely free of the exculpatory provision and to have the unlimited protection of § 8.07 (even though this would render illusory Florence's benefit from the exculpatory provision), more explicit language could have made that intention clear.

(2) David Casty's son Ronald, who had been made treasurer of Raimond, could not get along with Florence. (3) Florence indicated he would not work with one Vaughn West, who had been made vice-president of operations of Chelsea. (4) Florence wanted Chelsea to buy him out. We think that the trial judge was not plainly wrong (see *Chartrand* v. *Registrar of Motor Vehicles*, 347 Mass. 470, 473) in concluding that no one of these reasons constituted "substantial and material cause" for Florence's discharge.

(a) After Chelsea acquired Raimond, David Casty told Florence, "Ronald Casty will be your treasurer." Ronald, then twenty-three years old, had no financial experience. He was not an accountant, a comptroller, or a bookkeeper. Florence told David Casty that he did not think Ronald was qualified. Nevertheless, Ronald was made treasurer, and Florence found him a continuing problem and spoke to Ronald and his father concerning Ronald's conduct on various occasions. David Casty's action in hiring Ronald seems to be in conflict with the employment contract (see § 1 and fn. 4, *supra*) under which Florence was given "complete authority to administer the general operations of . . . [Raimond] including . . . [the] hiring and firing of employees." Florence's difficulties with Ronald could reasonably be found not to constitute a substantial and material cause for discharging Florence.

(b) In October, 1968, Vaughn West was hired by Chelsea (a "conglomerate" of some twenty-six companies, including Raimond) as vice-president in charge of all operations of Chelsea and its subsidiaries. Dunn took West to meet Florence and explained West's responsibilities. In late December, West told Harmon Stone, Florence's accountant, that Chelsea's board of directors had given up on Florence, that this was his last chance, and that, if Florence did not work with West, Florence would be discharged. When Florence heard of this conversation, he told West and David Casty that he was not working for West. At Stone's urging, Florence agreed to try to work with West, but was not given the opportunity. Florence was discharged on

February 24, 1969, by formal vote of Raimond's board without any discussion.

Under the employment contract (see fn. 4), Florence was to "perform such duties and shall have such authority and powers as were previously . . . performed by him for" Raimond and also "such other duties that the [b]oard of [d]irectors of . . . [Raimond] may reasonably require." Florence was "to be accountable for his instructions and his performance only to David Casty, [c]hairman of the [b]oard of . . . [Raimond], or Norman Dunn, a [v]ice [p]resident of . . . [Raimond] or their successors." Subject to these provisions, Florence was "given . . . complete authority to administer . . . [Raimond's] general operations." As one witness testified, "Florence was a loner, had to be running his own business one hundred per cent, couldn't function within the framework of an organization." If this was the case, the contract was appropriately expressed to protect him to a considerable extent in his desire to control the operations he was conducting. The trial judge could reasonably conclude that, in the circumstances, putting West in charge of Raimond's operations was a breach of the employment contract and that Florence was not required to accept West as having greater authority over Raimond's operations. See *Crabtree* v. *Bay State Felt Co.* 227 Mass. 68, 70. See also *Mansfield* v. *Lang,* 293 Mass. 386, 390–391.[9]

(c) Florence indicated that he would quit Raimond after all contingency payments had been made to him. The judge found that Florence had informed David Casty of this intention before executing the employment contract, under which Florence's obligation to work for Raimond was not to extend beyond "[t]he date on which . . .

---

[9] Chelsea argues (1) that Florence's refusal to work with West "disenabled . . . [Raimond] from seeing to a continuity in management"; and (2) that Florence's contract required him "to take his instructions from David Casty, who, in fact, through intermediaries instructed him to work with Vaughn West." Although Casty could require Florence to work with West "to advance the interests of the company" in many ways, the employment contract in terms prevented a demotion of Florence by giving West greater authority over Raimond's operations.

[Chelsea] shall have no further obligation to make any payments . . . on account of the [c]ontingent [p]rice." The judge reasonably found that Florence's statements (in effect that he intended to exercise his rights under the employment contract) were not substantial cause for his dismissal.

(d) The evidence did not require findings (1) that Florence asked to have his contract bought out before being told by David Casty that he was to leave, or (2) that his discharge was primarily brought about by Florence's own expressed desire to get out of the business. The trial judge could reasonably conclude that these matters did not amount to a substantial and material cause for Florence's dismissal.

(e) Chelsea argues that reasons (other than those found by the trial judge) would justify Florence's dismissal. (1) Statements by Florence (concerning discussions between David Casty and Harmon Stone), made before the employment contract was executed, could be viewed as not constituting reason for discharge from employment begun thereafter. (2) Statements by Florence that Raimond's business had been "stolen" from him could be taken as a "jocular" way of saying that Chelsea had bought the business "very cheaply." (3) A misunderstanding between David Casty and Florence over a bonus could reasonably be regarded as not amounting to material cause for dismissal. Chelsea concedes that Florence "performed well in enhancing the business of Raimond" and there was testimony that he produced "around" $980,000 for fiscal year 1968, more than enough to earn his bonus under either his own or Casty's formula for a bonus. The trial judge could reasonably regard Florence's statements (sometimes provocative or rude) to and about David Casty (with respect to this misunderstanding) as more of an afterthought by Chelsea officials than a real reason for Florence's dismissal. An additional $1,000 paid to Florence to attend a trade show during his vacation, at David Casty's request, could be viewed in the same manner.

4. Chelsea argues that it, as a separate corporate entity, is entitled to equitable relief even if Florence was discharged by Raimond without substantial and material cause. Chelsea's ownership of all Raimond's stock, and the existence of overlapping directors and officers, could be found to have made Chelsea in substance responsible for Florence's discharge. We think that the trial judge, in the circumstances, reasonably denied Chelsea injunctive relief.

*Final decree affirmed with costs of appeal.*