USCA1 Opinion

 

 March 30, 1993 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1139 MARGRET REY, Plaintiff, Appellee, v. RICHARD G.D. LAFFERTY, ET AL., Defendants, Appellants. ____________________ No. 92-1177 MARGRET REY, Plaintiff, Appellant, v. RICHARD G.D. LAFFERTY, ET AL., Defendants, Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Selya, Cyr and Boudin, Circuit Judges. ______________ ____________________ H. Joseph Hameline with whom Andrea M. Fish and Mintz, Levin, __________________ ______________ ______________ Cohn, Ferris, Glovsky & Popeo, PC were on brief for appellee Rey. _________________________________ Charles Donelan with whom Katherine E. Perrelli, Kristen G. ________________ _______________________ ___________ McGurn and Day, Berry & Howard were on brief for appellants Lafferty, ______ ___________________ et al. ____________________ March 30, 1993 ____________________ CYR, Circuit Judge. Margret Rey, who owns the copy- CYR, Circuit Judge. _____________ right to the "Curious George" children's books, challenges an award of damages to Lafferty Harwood & Partners ("LHP") for Rey's withholding of approval of various ancillary products utilizing the "Curious George" character under their 1983 licensing agree- ment. LHP appeals the district court order awarding Rey damages and future royalties on certain other "Curious George" products. We affirm in part and reverse in part. I I BACKGROUND BACKGROUND __________ "Curious George" is an imaginary monkey whose antics are chronicled in seven books, written by Margret and H.A. Rey, which have entertained readers since the 1940s. A mischievous personality consistently lands Curious George in amusing scrapes and predicaments. The more recent "monkey business" leading to the present litigation began in 1977 when Margret Rey granted Milktrain Productions an option to produce and televise 104 animated "Curious George" film episodes. The option agree- ment was contingent on Milktrain's obtaining financing for the film project, and adverted to a potential agreement to license _________ "ancillary products," based on the "Curious George" character, once the 104 film episodes had been completed. 3 A. The Original Film Agreements. A. The Original Film Agreements. ____________________________ Milktrain approached LHP, a Canadian investment firm, to obtain financing for the project. LHP agreed to fund the venture by selling shares in the project to investors (hereinaf- ter: the "Milktrain Agreement"); LHP and its investors were to divide a 50% share of Milktrain's profits on the films and on any future ancillary products. With the financing commitment in place, Rey granted Milktrain and LHP a limited license "to produce (within a two- year period from the date of exercise) one hundred and four (104) four minute film episodes based on the ["Curious George"] charac- ter solely for broadcast on television" (hereinafter: the "Rey License"). Rey was to receive a fee for assisting with the editing and production of the episodes, and an additional royalty amounting to 10% of the revenues from any film telecasts. The Rey License made no mention of ancillary product rights. Never- theless, LHP promoted the project to investors through a prospec- tus (hereinafter: the "1978 Private Placement Memorandum") which represented, inter alia, that "the production contract [with Rey] _____ ____ gives LHP the right to participate in the financing of . . . the option . . . to undertake the exploitation of other rights to 'Curious George' including manufacturing, food, licensing and other commercial areas of exploitation." B. The Revised Agreements. B. The Revised Agreements. ______________________ The film project soon encountered delays and financial setbacks. By early 1979, though only 32 of the 104 episodes had 4 been completed, the original investment funds had been virtually exhausted. In order to rescue the project and complete the films to Rey's satisfaction, LHP offered to arrange additional financ- ing. In consideration, LHP insisted that the Milktrain Agreement be revised to permit LHP to assume control of the film production process and to receive higher royalties on the completed epi- sodes. Milktrain assented to these revisions, and the revised Milktrain Agreement (hereinafter: the "Revised Milktrain Agree- ment" or "RMA") was signed on November 5, 1979. As prelude to its description of the new obligations between Milktrain and LHP, the RMA recited that Milktrain and LHP owned "the rights to Curious George which have been obtained from . . . Rey" under the Rey License. The RMA further stated that: Investors acquiring the episodes shall ac- quire all right, title and interest therein, without limitation or reserve, including the original negative . . . . LHP shall have the right to participate on an equal basis with [Milktrain] in their right of first refusal after the present agency rights expire to undertake the exploitation of other rights to Curious George, including manufacturing, food, licensing and the publi- cation of the 104 episodes in book form . . . in accordance with the rights granted to [Milktrain] and LHP [by Rey] in [the Revised Rey License].1 Simultaneously with the negotiation of the RMA, LHP proposed several changes in the Rey License, including language ____________________ 1Shortly thereafter, Milktrain apparently assigned its share of ancillary product licensing rights to LHP, leaving LHP the sole owner of these rights. 5 which would have granted LHP the immediate right to "undertake the exploitation of other rights to 'Curious George,' including manufacturing, food, licensing and the publication of the 104 episodes in book form." Rey rejected the LHP proposal in a letter to Richard G. D. Lafferty (president and C.E.O. of LHP): "I have repeatedly stated to Milktrain and to you that I will not consider negotiating such rights before the films are done." Rey did consent, however, to certain changes to the royalty arrange- ments, whereby Rey would receive a 10% share of film revenues only "after the investors have recouped [their investment] and certain soft dollar commitments . . . have been paid." On November 5, 1979, concurrently with the execution of the Revised Milktrain Agreement, a revised version of the Rey License (hereinafter: the "Revised Rey License" or "RRL") was executed, incorporating these changes, and superseding the original Rey License. The RRL recited that the original Rey License had granted Milktrain and LHP the right to produce and distribute animated "Curious George" films "for television view- ing," but made no mention of the "ancillary product" rights unsuccessfully sought by LHP. As agreed, LHP undertook to arrange further financing to complete the film project. On November 23, 1979, LHP released another prospectus (hereinafter: the "1979 Private Placement Memorandum") to which it attached the Revised Milktrain Agree- ment. The 1979 Private Placement Memorandum again stressed the prospect of eventual revenues from ancillary products but noted 6 that these rights "have yet to be negotiated" with Rey. C. The Ancillary Products Agreement. C. The Ancillary Products Agreement. ________________________________ Production of the 104 TV episodes was completed in 1982. On January 3, 1983, an Ancillary Products Agreement (or "APA") was signed by Rey and LHP, granting LHP a general right to license "Curious George" in spin-off ("ancillary") products for a renewable term of five years. The APA defined "ancillary prod- ucts" as: All tangible goods . . . excluding books, films, tapes, records, or video productions . . . . However, for stories already owned by [LHP] and which have been produced as 104 episodes under the license granted in the January, 1978 agreement and the November 5, 1979 revision of that agreement, [LHP] shall have the right to produce books, films, tapes, records and video productions of these episodes under this Agreement, subject to [Rey's] prior approval . . . which prior approval shall not be unreasonably withheld. In return for these rights, Rey was to receive one-third of the royalties on the licensed products, with certain minimum annual payments guaranteed. Rey retained the right to disapprove any ___ product, and to propose changes which would make a disapproved _______ product acceptable to her. The APA provided, inter alia, that _____ ____ Rey's approval would not be withheld "unreasonably." D. The Houghton Mifflin Contract. D. The Houghton Mifflin Contract. _____________________________ Following the execution of the Ancillary Products Agreement, LHP assigned its licensing rights to a new subsidiary, Curgeo Enterprises, which turned its attention to licensing the 7 "Curious George" character in various product forms.2 On March 27, 1984, Curgeo executed a contract with Houghton Mifflin Company to publish the 104 television film episodes in the form of a children's book series. The contract provided that Houghton Mifflin would publish at least four books, with illustrations drawn directly from the film negatives, in each year from 1984 through 1987; the contract was renewable for an additional five- year term if LHP and Rey agreed to extend the APA beyond 1987. Pursuant to the contract, Houghton Mifflin published four books each year from 1984 through 1987. In 1987, LHP notified Houghton Mifflin that it had declined to extend the APA, but that Curgeo had "entered into a new operating agreement which permits us to continue to act in the capacity in which we have been acting for the last five years. . . . [Y]ou are free to pick up your option to renew." In response, Houghton Mifflin extended its contract for the addi- tional five-year term, publishing an additional four books in 1988 and again in 1989. It ceased publication of the book series in 1990, when Rey advised that the APA had been cancelled. E. Other Product Licenses. E. Other Product Licenses. ______________________ Curgeo moved aggressively to license the "Curious George" character in other product areas as well. Beginning in 1983, the "Curious George" TV episodes were licensed to Sony ____________________ 2Curgeo Enterprises is not named in the Rey complaint; Curgeo Agencies Inc. and Curgeo Overseas, Inc., are named as defendants. We refer to the three entities collectively as "Curgeo." 8 Corporation, which transferred the images from the television film negatives to videotape. LHP takes the position that the Sony video license was entered pursuant to the RRL; Rey claims it is subject to the APA. See supra at pp. 6-7. ___ _____ In 1983, Curgeo licensed "Curious George" to Eden Toys Inc., which proposed to market a "Curious George" plush toy. In the beginning, Rey rejected Eden's proposed designs for the toy, but Eden eventually proposed several versions which were accept- able to Rey. The plush toy was marketed from 1983 to 1990, but experienced poor sales and generated less revenue than expected. Eden blamed the poor market performance on Rey's alterations to Eden's original design proposals. In 1987, Curgeo received a commitment from Sears, Roebuck to market "Curious George" pajamas through the Sears catalog. The Sears pajama project promised high returns, but catalog deadlines necessitated immediate approval of a product design. Glen Konkle, Curgeo's agent, brought Rey a prototype pajama and a flat paper sketch of "Curious George" which had been proposed as the basis for the final pattern. Rey rejected the proposal, complaining that the pajama material was "hard, ugly [and] bright yellow," and that the sketch of "Curious George" was "plump" and "not recognizable." The catalog deadline passed and the pajama manufacturers withdrew their bids. In addition, Beach Paper Products, which had orally agreed to license "Curious George" for a line of paper novelties, withdrew its offer after learning that "Curious George" products would not receive expo- 9 sure in the Sears catalog. In 1988, Curgeo licensed "Curious George" to DLM Inc., which intended to use the "Curious George" character in a trilogy of educational software. Rey approved the software in principle, and production began in July 1988. In August 1988, however, DLM withdrew its plans to complete the "trilogy" after Rey telephoned DLM's project director and harshly criticized the design of the first software product and the accompanying manual developed by DLM. F. The Ancillary Products Agreement Renewal. F. The Ancillary Products Agreement Renewal. ________________________________________ Due in part to these product rejections, LHP earned less money than it anticipated from ancillary products. When the APA came up for renewal in January 1988, LHP declined to exercise its option for an additional five-year term. Instead, the parties agreed to renew on a month-to-month basis, terminable by either party on one month's notice. Rey's royalty rate was increased to 50% (effective January 3, 1988), but with no guaran- teed minimum payment. On April 10, 1989, Rey terminated the APA. LHP responded by advising that Curgeo would "continue to adminis- ter those licenses which [remained] outstanding and report to you from time to time accordingly." LHP thereupon continued to market the Sony videos and to publish the television films in book form under the Houghton Mifflin agreements. G. "Curious George" Goes to Court. G. "Curious George" Goes to Court. _____________________________ On February 8, 1991, Rey filed suit against Lafferty, 10 Curgeo and LHP, in connection with LHP's continuing, allegedly unauthorized production of the Houghton Mifflin books and Sony videos. Rey's complaint alleged violations of federal copyright, trademark and unfair-competition statutes, breach of contract, and violations of Mass. Gen. L. ch. 93A ("chapter 93A"); it sought to enjoin further violations and to recover unpaid royal- ties on the books and videos. LHP countersued, claiming that Rey unreasonably had withheld approval of various products while the APA remained in force. The LHP complaint alleged breach of contract, interference with contractual and advantageous business relationships, and violation of chapter 93A. After a four-day bench trial, the district court found for Rey on her claims for breach of contract, ruling that the book and video licenses were governed by the APA and that Rey was entitled to recover $256,327 in royalties. The court found for LHP on several LHP counterclaims, however, holding that Rey unreasonably had withheld approval of, inter alia, the Sears _____ ____ pajamas, the DLM software, and Eden's original plush toy design. LHP was awarded $317,000, representing lost profits and conse- quential damages resulting from Rey's rejection of these prod- ucts. II II DISCUSSION DISCUSSION __________ "Under Massachusetts law, the 'interpretation of a contract is ordinarily a question of law for the court'." 11 Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st _________________________________ ____ Cir. 1992) (quoting Edmonds v. United States, 642 F.2d 877, 881 _______ _____________ (1st Cir. 1981)); see also, e.g., Lawrence-Lynch Corp. v. Depart- ___ ____ ____ ____________________ _______ ment of Environmental Mgmt., 392 Mass. 681, 682, 467 N.E. 2d 838, ___________________________ 840 (1984); Sparks v. Microwave Associates, Inc., 359 Mass. 597, ______ __________________________ 600, 270 N.E. 2d 909, 911 (1971).3 Only if the contract is am- biguous will there arise issues of fact reviewable for clear error. See Dwek, 970 F.2d at 993; see also ITT Corp. v. LTX ___ ____ ___ ____ _________ ___ Corp., 926 F.2d 1258 (1st Cir. 1991); Fashion House, Inc. v. K _____ ___________________ _ Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989) (New York law). __________ "Contract language is usually considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken," K _ Mart, 892 F.2d at 1083 (citing In re Navigation Technology Corp., ____ _________________________________ 880 F.2d 1491, 1495 (1st Cir. 1989)). The ambiguity determina- ____________________ 3The Rey License and RRL contain choice-of-law provisions providing for the application of New York law, and the Milktrain Agreement and RMA contain choice-of-law provisions providing for the application of the law of the Province of Quebec, Canada. Neither party alludes to these contractual provisions in their briefs, however, and both parties appear to have premised their trial presentations and appellate briefs on the application of Massachusetts law. In accordance with their choice, and since a "reasonable relation" exists between their contract and the Massachusetts forum, see Carey v. Bahama Cruise Lines, 864 F.2d ___ _____ ____________________ 201, 206 (1st Cir. 1988), we apply Massachusetts law. See Borden ___ ______ v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) _________________________ ("[w]here . . . the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forego independent analysis and accept the parties' agreement"); accord Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 547 ______ _______ __________________________ (1st Cir. 1989); Moores v. Greenberg, 834 F.2d 1105, 1107 n.2 ______ _________ (1st Cir. 1987). 12 tion itself is subject to plenary review, id., and parol evidence ___ may not be used to "create ambiguity where none otherwise ex- ists." See Boston Car Co. v. Acura Auto. Div., 971 F.2d 811, 815 ___ ______________ ________________ (1st Cir. 1992) (citing ITT Corp., 926 F.2d at 1261). _________ A. The Book/Video Claims. A. The Book/Video Claims. _____________________ The Rey complaint alleged that LHP's only right to publish the "Curious George" TV episodes in book and video form derived from the Ancillary Products Agreement, was subject to the APA's royalty provisions, and expired when Rey terminated the APA in 1989. LHP responds that the book and video rights to the TV episodes were governed by the parties' other agreements, specifi- cally the Revised Rey License, which (according to LHP) incor- porated the Revised Milktrain Agreement. According to LHP, these other agreements continued in effect notwithstanding termination of the APA; moreover, these agreements provided that no royalties were due Rey before LHP's investors recovered their investment in the 104 TV films.4 The district court accepted the interpreta- tion urged by Rey, based on the language of the various contracts and the circumstances surrounding their execution. We agree. 1. The Houghton Mifflin Books. 1. The Houghton Mifflin Books. __________________________ The Ancillary Products Agreement provided, inter alia, _____ ____ that for stories already owned by [LHP] . . . which have been produced as 104 episodes ____________________ 4LHP contends that $250,000 (U.S.) had yet to be recovered by the investors at the time the present action was commenced. 13 under the license granted in the January, 1978 agreement and the November 5, 1979 revi- sion of that agreement, [LHP] shall have the right to produce books, films, tapes, records _____ and video productions of these episodes under _____ ___________ _____ this Agreement, subject to [Rey's] prior ____ _________ approval . . . (Emphasis added.) Throughout the document the term "this Agree- ment," utilizing the capital letter "A", refers to the APA. Thus, the plain language of the operative provision clearly con- templates that the APA was to govern the licensing of any books and "video productions" arising from the 104 films. See Barilaro ___ ________ v. Consolidated Rail Corp., 876 F.2d 260, 265 n.10 (1st Cir. ________________________ 1989) ("it is . . . 'a general rule in the construction of a written instrument that the same word occurring more than once is to be given the same meaning unless a different meaning is demanded by the context.'") (quoting Dana v. Wildey Sav. Bank, ____ ________________ 294 Mass. 462, 466, 2 N.E.2d 450, 453 (1936)). LHP argues, nonetheless, that a narrow meaning must be ascribed to the quoted APA language, insofar as the RMA purported to grant investors "all right, title and interest [to the 104 film episodes], without limitation or reserve, including the original negative." The problem with LHP's argument is that Rey never signed the RMA. LHP concedes this, but argues that the RMA and RRL were negotiated and executed simultaneously by LHP, and must be interpreted in pari materia. See, e.g., Interstate __ ____ _______ ___ ____ __________ Commerce Comm'n v. Holmes, slip op. at 10-11 (1st Cir. Jan. 11, _______________ ______ 1993) (escrow agreement and consent decree read together, as "synergistic" documents); accord Chelsea Indus., Inc. v. Flor- ______ _____________________ _____ 14 ence, 358 Mass. 50, 55-56, 260 N.E.2d 732 (1970); Thomas v. ____ ______ Christensen, 12 Mass. App. Ct. 169, 422 N.E.2d 472, 476 (1981). ___________ The Massachusetts courts sometimes have held that the party to be bound need not have signed each component part of an integrated agreement where it is the "sense" of the transaction, as support- ed by reliable indicia in the writings which were signed by the party to be bound, that a unitary transaction was contemplated by the parties. See Chase Commercial Corp. v. Owen, 32 Mass. App. ___ ______________________ ____ Ct. 248, 588 N.E.2d 705 (1992) (holding that non-signatory guarantor was bound by jury trial waiver contained in loan and security agreements, though guarantee agreement contained no such waiver, where "the three documents were part of one transac- tion"); see also Gilmore v. Century Bank & Trust Co., 20 Mass. ___ ____ _______ _________________________ App. Ct. 49, 50, 477 N.E.2d 1069, 1073 (1985) (holding that non- signatory trustee could recover for breach of workout agreement, even though not a party to its terms, based on "sense" of agree- ment, and "such factors as simultaneity of execution, identity of subject matter and parties, cross-referencing, and interdepen- dency of provisions"). On this theory, LHP contends, Rey's signature on the RRL bound her to the language of the RMA, and authorized LHP to transfer the television episodes to book form, using available technology. However, where contract language contains no unambigu- ous indicia of the parties' mutual intent to enter into a unitary transaction, we review for "clear error" the fact-dominant deter- mination whether their separate documents were intended by the 15 parties as an integrated agreement. Interstate Commerce Comm'n __________________________ v. Holmes, slip op. at 10-11; Holmes Realty Trust v. Granite City ______ ___________________ ____________ Storage Co., 25 Mass. App. Ct. 272, 517 N.E.2d 502, 504 (1988) ____________ ("it would be open to a fact finder . . . to treat [separate ____ __ _ ____ ______ documents] as intended by the parties to be parts of a single transaction") (emphasis added); Fred S. James & Co. v. Hoffmann, ___________________ ________ 24 Mass. App. Ct. 160, 163, 507 N.E.2d 269, 271 (1987). In the present case, we find no "clear error" in the district court's determination that the parties contemplated separate (though related) transactions for film rights and ________ financing. The evidence cut both ways. On the one hand, the RMA and the RRL were executed at approximately the same time, with some overlap in their internal references and subject matter. On the other hand, their respective provisions are less in unison than parallel.5 Most importantly, the written and circumstan- tial indicia sharply contradict any suggestion of a meeting of the minds relating to the licensing of ancillary products. Rey did not participate in negotiating the RMA, did not sign it, was ____________________ 5Even if the RMA and RRL were jointly construed, their language might point away from the interpretation urged by LHP. Section 2(i) of the RMA granted LHP's investors "all right, title and interest" in the 104 T.V. episodes, "without limitation or reserve," but 1(a) tempered this grant by defining the rights as "described herein, and set forth in Schedule 'A' [the RRL]." This language suggests that the "right, title, and interest" language of the RMA was meant only to confirm and restate, and _______ _______ not to expand upon, the RRL's parallel, but more limited, grant of rights. Cf. Fred S. James & Co., 24 Mass. App. Ct. at 164, ___ ____________________ 507 N.E.2d at 272 (finding no conflict between simultaneously executed instruments, where their language and the extrinsic evidence suggested independent obligations arising from simulta- neous contracts). 16 never made a party to its terms, and expressly refused, during _________ _______ ______ the RRL negotiations, to license "Curious George" for the "ancil- ___ ___ ____________ __ _______ _______ ______ ___ ___ ______ lary" purposes now urged by LHP. See supra at p. 6. Moreover, ____ ________ ___ _____ __ ___ ___ _____ the 1979 Private Placement Memorandum prepared by LHP acknowledg- es Rey's nonacceptance by attaching the RRL as an exhibit and noting that ancillary product rights "have yet to be negotiated" with Rey. Finally, the parties' intention to exclude the Hough- ton Mifflin books from the RRL, and their intention to cover them in the APA, are corroborated by their subsequent course of dealing: among other things, the record shows that LHP paid Rey royalties on the books and videos on several occasions at the 33% __ ___ ___ rate required under the APA, rather than the 10% rate prescribed ____ ________ _____ ___ ___ by the RRL, and that Curgeo expressly keyed the dates of the Houghton Mifflin contract to the term (and anticipated renewal __ ___ ____ ___ ___________ _______ term) of the Ancillary Products Agreement: ____ __ ___ _________ ________ _________ By September 30, 1987, Curgeo [will] inform [Houghton Mifflin] in writing as to whether Curgeo has exercised its option to exploit the character "Curious George" through December 31, 1993 and, if Curgeo has exer- cised said option, Curgeo shall give the Publisher the option to extend this Agreement through December 31, 1993. It was for the district court to balance the evidence in the first instance, see Holmes Realty Trust, 517 N.E. 2d at ___ ___________________ 504, and we discern no sound reason to disagree with its find- ings, particularly on "clear error" review. See Interstate ___ __________ Commerce Comm'n v. Holmes, slip op. at 13 (citing Cumpiano v. _______________ ______ ________ Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990)) ___________________________ 17 (even if proffered interpretation did "[give] rise . . . to another plausible view of the evidence," reversal not warranted on "clear error" review).6 To sum up: Since the district court supportably found that the RRL and the RMA are separate, though related, agree- ments, the RMA's purported grant of rights did not bind Rey, who was bound only by the grant of rights she endorsed in the RRL and APA. The RRL contained no grant of rights to produce the Hough- ton Mifflin books, and the APA, which granted the right "to produce books . . . of these episodes," obligated LHP to pay Rey royalties on the books without regard to whether LHP's investors had recouped their investment on the television film project. Thus, the district court did not err in finding that LHP's withholding of the Houghton Mifflin book royalties was wrongful, and we affirm its ruling on this point. ____________________ 6We reject LHP's further contention that Rey's failure to protest publication of the four Houghton Mifflin books in 1990 estops her from cancelling the book and video contracts under the APA. Where more than one inference fairly may be drawn from the evidence and an estoppel ruling turns on an issue of fact, we review for clear error. United States v. Marin, 651 F.2d 24, 29 ______________ _____ (1st Cir. 1981); Morgan Guaranty Trust Co. v. Third Nat'l Bank, __________________________ _________________ 529 F.2d 1141, 1144 (1st Cir. 1976). In our view, Rey's conduct does not require an inference that she acquiesced in the publica- tion of these books under the APA. Rather, Rey protested the publication of the four books by filing suit shortly after realizing the unauthorized nature of Houghton Mifflin's continued publication. The district court apparently found that Rey's one- year delay, dating from the first unauthorized publication until the filing of Rey's suit for injunctive relief, was not "unrea- sonable" in the circumstances, and we decline to disturb its findings on this issue. 18 2. The Sony Videos. 2. The Sony Videos. _______________ LHP's claim to the Sony video royalties is more compli- cated: assuming the videos were not covered by the contractual clause in the RMA, see supra Part II.A.1., might they nonetheless ___ _____ have been covered by the grant of rights in the RRL, which licensed LHP to produce the 104 episodes "for television view- ___ __________ _____ ing"? The district court thought not: the parties' "reference ___ to television viewing . . . in a licensing agreement . . . does not include [video technology] . . . which probably was not in existence at the time that the rights were given." a. "New Uses" and Copyright Law. a. "New Uses" and Copyright Law. ___________________________ For purposes of the present appeal, we accept the uncontested district court finding that the relevant video technology "was not in existence at the time that the rights" were granted under the RRL in January 1979. Consequently, it must be inferred that the parties did not specifically contem- plate television "viewing" of the "Curious George" films in videocassette form at the time the RRL was signed. Such absence of specific intent typifies cases which address "new uses" of licensed materials, i.e., novel technological developments which ____ generate unforeseen applications for a previously licensed work. See Melville B. Nimmer and David Nimmer, 3 Nimmer on Copyright ___ ___________________ 10.10[B] at 10-85 (1992) ("Nimmer") ("the . . . fact that we ______ are most often dealing with a later developed technological process (even if it were known in some form at the time of execution) suggests that the parties' ambiguous phraseology masks 19 an absence of intent rather than a hidden intent which the court simply must 'find'"). Normally, in such situations, the courts have sought at the outset to identify any indicia of a mutual general intent to _______ apportion rights to "new uses," insofar as such general intent can be discerned from the language of the license, the surround- ing circumstances, and trade usage. See, e.g., Murphy v. Warner ___ ____ ______ ______ Bros. Pictures, Inc., 112 F.2d 746, 748 (9th Cir. 1940) (grant of ____________________ "complete and entire" motion picture rights to licensed work held to encompass later-developed sound motion picture technology); Filmvideo Releasing Corp. v. Hastings, 446 F. Supp. 725 (S.D.N.Y. _________________________ ________ 1978) (author's explicit retention of "all" television rights to licensed work, in grant of motion picture rights predating tech- nological advances permitting movies to be shown on television, included retention of right to show motion picture on televi- sion). Where no reliable indicia of general intent are discern- _______ ible, however, courts have resorted to one of several interpre- tive methods to resolve the issue on policy grounds. Under the "preferred" method, see 3 Nimmer at 10-85, ___ ______ recently cited with approval in SAPC, Inc. v. Lotus Development __________ _________________ Corp., 921 F.2d 360, 363 (1st Cir. 1990), the court will con- _____ clude, absent contrary indicia of the parties' intent, that "the licensee may properly pursue any uses which may reasonably be said to fall within the medium as described in the license." 3 Nimmer at 10-86. Under this interpretive method, the courts will ______ presume that at least the possibility of nonspecific "new uses" 20 was foreseeable by the contracting parties at the time the licensing agreement was drafted; accordingly, the burden and risk of drafting licenses whose language anticipates the possibility of any particular "new use" are apportioned equally between licensor and licensee. See, e.g., Bartsch v. Metro-Goldwyn- ___ ____ _______ ______________ Mayer, Inc., 391 F.2d 150, 155 (2d Cir.), cert. denied, 393 U.S. ___________ _____ ______ 826 (1968) ("[i]f the words [of the license] are broad enough to cover the new use, . . . the burden of framing and negotiating an exception should fall on the grantor" of the licensed rights). An alternative interpretive method is to assume that a license of rights in a given medium (e.g., ____ 'motion picture rights') includes only such uses as fall within the unambiguous core meaning of the term . . . and excludes any uses which lie within the ambiguous penumbra (e.g., exhibition of motion picture film on ____ television). Thus any rights not expressly (in this case meaning unambiguously) granted are reserved. See 3 Nimmer at 10-85; see also Bourne Co. v. Walt Disney Co., ___ ______ ___ ____ __________ _______________ 1992 Copyr. L. Rep. (CCH) 26,934 (S.D.N.Y. 1992) ("if the disputed use was not invented when the parties signed their agreement, that use is not permitted under the contract"). This method is intended to prevent licensees from "'reap[ing] the entire windfall' associated with the new medium," Cohen v. _____ Paramount Pictures Corp., 845 F.2d 851, 854 (9th Cir. 1988) _________________________ (quoting Neil S. Nagano, Comment, Past Software Licenses and the ______________________________ New Video Software Medium, 29 U.C.L.A. L. Rev. 1160, 1184 (- ___________________________ 1982)), and is particularly appropriate in situations which 21 involve overreaching or exploitation of unequal bargaining power by a licensee in negotiating the contract. See, e.g., Bartsch, ___ ____ _______ 391 F.2d at 154 & n.2 (citing Ettore v. Philco Television Broad- ______ ________________________ casting Corp., 229 F.2d 481 (3d Cir. 1955) (suggesting narrow _____________ construction where licensor was not "an experienced businessman" and had no "reason to know of the . . . potential" for new uses at the time he signed the relevant agreement)). It may also be appropriate where a particular "new use" was completely unfore- seeable and therefore could not possibly have formed part of the _____ ___ ________ bargain between the parties at the time of the original grant. Cohen, 845 F.2d at 854; Kirke La Shelle Co. v. Paul Armstrong _____ _____________________ _______________ Co., 263 N.Y. 79, 188 N.E. 163 (1933). Obviously, this method ___ may be less appropriate in arm's-length transactions between sophisticated parties involving foreseeable technological devel- opments; in such situations, narrow construction of license grants may afford an unjustifiable windfall to the licensor, who would retain blanket rights to analogous "new uses" of copyright material notwithstanding the breadth of the bargained-for grant. See generally 3 Nimmer at 10-85 ("it is surely more arbitrary and ___ _________ ______ unjust to put the onus on the licensee by holding that he should have obtained a further clarification of a meaning which was already present than it is to hold that the licensor should have negated a meaning which the licensee might then or thereafter rely upon.").7 ____________________ 7The problem becomes particularly acute when the analogous technology develops so rapidly as to supplant the originally contemplated application of the licensed work, rendering the 22 b. Video Technology as "New Use". b. Video Technology as "New Use". ____________________________ These fine-tuned interpretive methods have led to divergent results in cases considering the extension of televi- sion rights to new video forms. Thus, for example, in Rooney v. ______ Columbia Pictures Industries, Inc., 538 F. Supp. 211 (S.D.N.Y.), __________________________________ aff'd, 714 F.2d 117 (2d Cir. 1982), cert. denied, 460 U.S. 1084 _____ ____ ______ (1983), the court determined that a series of contracts granting motion picture distributors a general license to exhibit plain- tiffs' films "by any present or future methods or means" and "by __ ______ any means now known or unknown" fairly encompassed the right to ___ _____ __ _______ distribute the films by means of later-developed video technol- ogy. The contracts in question gave defendants extremely broad rights in the distribution and exhibition of pre-1960 films, plainly _______ intending that such rights would be without _________ limitation unless otherwise specified and further indicating that future technological advances in methods of reproduction, trans- mission and exhibition would inure to the benefit of defendants. (Emphasis added.) Similarly, in Platinum Record Co. v. ______________________ Lucasfilm, Ltd., 566 F. Supp. 226, 227 (D. N.J. 1983), the court ________________ ____________________ parties' original bargain obsolete. Thus, for example, broad grants of "motion picture rights," made before technological advances permitted the combination of moving images with sound, _____ later were held, typically, to encompass the rights to sound motion picture technology; a narrower holding would have left the original license virtually worthless, despite its broad language, and would have provided the licensor with an undeserved windfall. See, e.g., Murphy, 112 F.2d at 748; L.C. Page & Co. v. Fox Film ___ ____ ______ ________________ ________ Corp., 83 F.2d 196 (2d Cir. 1936). _____ 23 held that videocassette rights were encompassed by a broad synchronization license to "exhibit, distribute, exploit, market, and perform [a motion picture containing licensed musical compo- sition] . . . perpetually throughout the world by any means or methods now or hereafter known." Again, the court rested its holding on the "extremely broad and completely unambiguous" contractual grant of general rights to applications of future _______ technologies, which was held to "preclude[] any need in the Agreement for an exhaustive list of specific potential uses of the film." Id. ___ By contrast, in Cohen, 845 F.2d at 853-54, the Ninth _____ Circuit concluded that a 1969 contract granting rights to "[t]he exhibition of [a] motion picture [containing a licensed work] . . . by means of television," but containing a broad restriction __ _____ __ __________ reserving to the licensor "all rights and uses in and to said musical composition, except those herein granted," did not encom- ___ ___ pass the right to revenues derived from sales of the film in videocassette form. After deciding that "[t]he general tenor of the [contract] section [in which the granting clause was found] contemplate[d] some sort of broadcasting or centralized distribu- ____________ __ ___________ _________ tion, not distribution by sale or rental of individual copies to ____ the general public," see id. at 853 (emphasis added), the court ___ ___ stressed that the playing of videocassettes, with their greater viewer control and decentralized access on an individual basis, did not constitute "exhibition" in the sense contemplated by the contract. 24 Though videocassettes may be exhibited by using a television monitor, it does not fol- low that, for copyright purposes, playing videocassettes constitutes "exhibition by television." . . . Television requires an intermediary network, station, or cable to send the television signals into consumers' homes. The menu of entertainment appearing on television is controlled entirely by the intermediary and, thus, the consumer's selec- tion is limited to what is available on vari- ous channels. Moreover, equipped merely with a conventional television set, a consumer has no means of capturing any part of the televi- sion display; when the program is over it vanishes, and the consumer is powerless to replay it. Because they originate outside the home, television signals are ephemeral and beyond the viewer's grasp. Videocassettes, of course, allow viewing of a markedly different nature. . . . By their very essence, . . . videocassettes liberate viewers from the constraints otherwise in- herent in television, and eliminate the in- volvement of an intermediary, such as a net- work. Television and videocassette display thus have very little in common besides the fact that a conventional monitor of a television set may be used both to receive television signals and to exhibit a videocassette. It is in light of this fact that Paramount ar- gues that VCRs are equivalent to "exhibition by means of television." Yet, even that assertion is flawed. Playing a videocassette on a VCR does not require a standard televi- sion set capable of receiving television signals by cable or by broadcast; it is only necessary to have a monitor capable of dis- playing the material on the magnetized tape. Id. at 853-54. ___ Most recently, in Tele-Pac, Inc. v. Grainger, 570 _______________ ________ N.Y.S.2d 521, appeal dismissed, 580 N.Y.S.2d 201, 588 N.E.2d 99 ______ _________ (1991), the court held (one judge dissenting) that a license to 25 distribute certain motion pictures "for broadcasting by televi- sion or any other similar device now known or hereafter to be made known" did not encompass the videocassette film rights. "Transmission of sound and images from a point outside the home _______ ___ ____ for reception by the general public . . . is implicit in the _______ ______ concept of 'broadcasting by television.' Conversely, while one may speak of 'playing,' 'showing,' 'displaying,' or even perhaps 'exhibiting' a videotape, we are unaware of any usage of the term 'broadcasting' in that context." Id. at 523 (emphasis added). ___ c. Video Rights and the RRL. c. Video Rights and the RRL. ________________________ Although the question is extremely close, under the interpretive methodology outlined above we conclude that the RRL's grant of rights to the 104 film episodes "for television viewing" did not encompass the right to distribute the "Curious ___ ___ George" films in videocassette form. First, unlike the contracts in Rooney and Lucasfilm, ______ _________ the RRL contained no general grant of rights in technologies yet to be developed, and no explicit reference to "future methods" of exhibition. Compare Lucasfilm, 566 F. Supp. at 227; Rooney, 538 _______ _________ ______ F. Supp. at 228. Rather, the RRL appears to contemplate a comparatively limited and particular grant of rights, encompass- ing only the 104 film episodes and leaving future uses of "Curi- ous George" to later negotiation in the ancillary products agreement. Although the RRL conversely contains no "specific limiting language," compare Cohen, 845 F.2d at 853, we believe _______ _____ such limitation is reasonably inferable from the situation of the 26 parties and the "general tenor of the section" in which the "television viewing" rights were granted. Second, as properly noted in Cohen, "television view- _____ ing" and "videocassette viewing" are not coextensive terms. Even though videocassettes may be, and often are, viewed by means of ___ __ VCRs on home television screens, see, e.g., Sony Corp. of America ___ ____ _____________________ v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984) (noting ____________________________ prevalent use of videocassette recorders for "time-shifting" of commercial television programming); Rooney, 538 F. Supp. at 228 ______ ("whether the exhibition apparatus is a home videocassette player or a television station's broadcast transmitter, the films are 'exhibited' as images on home television screens"), still, as the Ninth Circuit pointed out, a "standard television set capable of receiving television signals" is not strictly required for video- cassette viewing. Cohen, 845 F.2d at 854. "[I]t is only neces- _____ sary to have a monitor capable of displaying the material on the magnetized tape." Id. Indeed, a number of non-television ___ monitors recently marketed in the United States permit videocas- sette viewing on computer screens, flat-panel displays, and the like.8 Thus, we find insufficient reliable indicia of a con- trary mutual intent on the part of Rey and LHP to warrant dis- turbing the district court's implicit determination that the ____________________ 8See, e.g., Nathalie Welch, ASK Flat-Panel Display Now ___ ____ _____________________________ Available in U.S., MacWeek, January 4, 1993 (noting availability _________________ of flat-panel LCD monitor capable of displaying VCR output); Alice Laplante & Stuart Johnston, IBM Unveils Multimedia Adapter ______________________________ Board, Software Toolkit, InfoWorld, February 12, 1990 (noting ________________________ availability of MCA adapter card permitting videocassette images to be viewed and manipulated on PS/2 color computer monitor). 27 language of the RRL is not "broad enough to cover the new use." Bartsch, 391 F.2d at 155. _______ Finally, any lingering concerns about the correctness of the district court's interpretation are dispelled by the evidence that the RRL (including its "television viewing" clause) was drafted and proposed by LHP, a professional investment firm accustomed to licensing agreements. Rey, an elderly woman, does not appear to have participated in its drafting, and, indeed, does not appear to have been represented by counsel during the larger part of the transaction. Under these circumstances, as noted supra pp. 21-22, ambiguities in the drafting instrument are _____ traditionally construed against the licensor and the drafter. See also Nimmer at 10-71 ("ambiguities [in licensing agreements] ___ ____ ______ will generally be resolved against the party preparing the instrument of transfer"); U.S. Naval Institute v. Charter Commu- _____________________ ______________ nications, Inc., 875 F.2d 1044, 1051 (2d Cir. 1989) (interpreting _______________ ambiguous copyright assignment against sophisticated drafting party); see generally, e.g., Merrimack Valley Nat'l Bank v. ___ _________ ____ _____________________________ Baird, 372 Mass. 721, 724, 363 N.E.2d 688, 690 (1977) ("as a _____ general rule, a writing is construed against the author of the doubtful language . . . if the circumstances surrounding its use and the ordinary meaning of the words do not indicate the intend- ed meaning of the language"). Accordingly, as the Sony videocassette sales were not encompassed by the RRL, but governed exclusively by the APA, we find no conflict between the terms of the documents, and we 28 affirm the award of royalties to Rey under the APA. B. The "Junk Products" Counterclaim. B. The "Junk Products" Counterclaim. ________________________________ We next turn to the LHP counterclaim that Rey breached the APA by "wrongfully withholding" approval of ancillary prod- ucts she considered "junky."9 The district court agreed with LHP, holding that [The Ancillary Products Agreement] clearly contemplated the exploitation of Curious George. . . . Based on the testimony of Ms. Stoebenau and Mr. Konkle, I find that means that there may be produced with the charac- ter, junk products, junky products. . . . Plaintiff [had] the right . . . to insist on . . . an honest and good depiction of the __ ___ character. She did not have the right to _________ disapprove the quality of the product. . . . __ ___ _______ She had [the] right to disapprove an incor- rect, improper, bad depiction of Curious George. (Emphasis added.) The court further found: [A]lthough Mrs. Rey unquestionably approved many products, I find that she improperly disapproved the Sears project for the reasons just outlined; that she was unreasonable with respect to the Eden project, and that she was so rude to Ms. Craighead as to abort the second and perhaps later trilogies of the software. (Emphasis added.) After careful consideration, we must agree with Rey that the district court misapplied the APA. The product-approval procedure under the APA required ____________________ 9LHP does not challenge the district court ruling that its counterclaims for interference with contractual and advantageous business relationships, breach of the implied covenant of good faith and fair dealing, and unfair business practices under chapter 93A were time-barred. 29 that: LHP will submit product or other information sufficient to describe the product to you for prior approval. When a product is submitted . . . we will wait two weeks before proceed- ing. If we do not receive any disapproval of the product from you within two weeks we are entitled to presume that you approve of the product. If you do disapprove of any prod- uct, you will, if feasible, suggest such changes to LHP as may render the product acceptable to you, or, if you cannot make such feasible suggestions, you may refuse to approve the product. Product approval will not be unreasonably withheld. The term "product" is not defined in the APA. It is black letter law, however, that where "the words of an agreement are plain and free from ambiguity, they must be construed in their ordinary and usual sense," Boston Edison Corp. v. FERC, 856 F.2d 361, 365 (1st ___________________ ____ Cir. 1988), and, as we have noted in another context, the word 'product,' taken in its ordinary and usual sense, "simply means 'something produced.'" See K Mart, 892 F.2d at 1085 (quoting ___ _______ Webster's Third New International Dictionary 1810 (1981)). See ___ also id. at 1084 ("where possible, words should be given their ____ ___ natural meaning, consistent with the tenor of contractual terms"); id. at 1085 ("[I]t is sufficient [to avoid ambiguity] if ___ the language employed is such that a reasonable person, reading the document as a whole and in realistic context, clearly points toward a readily ascertainable meaning"). Considered in context, we think the "ordinary and usual" meaning of the broad term "product" plainly indicates the parties' mutual intention that each article bearing the likeness of "Curious George" not _______ 30 merely the likeness itself be approved by Rey. By contrast, the narrow interpretation urged by LHP would convert the term "product" into a mere synonym for the "Curious George" mark. Nowhere does the APA intimate that the parties contemplated that the term "product" was to be given so restrictive an interpretation. Indeed, elsewhere the APA plainly precludes the narrow interpretation urged by LHP by expressly distinguishing between the mark and the "product" with which it ______________ is used. See APA p.3 ("[LHP] will not sell or authorize the sale ___ or distribution of any product on or in connection with which _______ __ __ __ __________ ____ _____ 'Curious George' is used . . .") (emphasis added); id. at 3-4 _______ ______ __ ____ ___ (referring to separate approval procedure for "apparel prod- _______ _____ ucts").10 As the APA is unambiguous in this regard, the trial ____ ____________________ 10The interpretation we adopt accords with the common-sense understanding recognized in other areas of intellectual property law. Thus, for example, in the trademark context, courts fre- quently have recognized that "the trademark holder [has] the right to control the quality of the goods manufactured and sold under its trademark," Shell Oil Co. v. Commercial Petroleum, ______________ ______________________ Inc., 928 F.2d 104 (4th Cir. 1991) (emphasis added); El Greco ____ _________ Leather Products Co. v. Shoe World, 806 F.2d 392, 395 (2d Cir. _____________________ __________ 1986), cert. denied, 484 U.S. 817 (1987)) ("The actual quality of _____ ______ the goods is irrelevant; it is the control of quality that a _______ __ trademark holder is entitled to maintain") (emphasis added); see ___ also Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc., ____ ___________________________________ ____________________ 982 F.2d 633 (1st Cir. 1992) (hereinafter Produits Nestle) ________________ ("[r]egardless of the offending goods' actual quality, courts have issued Lanham Act injunctions solely because of the trade- mark owner's inability to control the quality of the goods bearing its name"). "The rationale for this requirement is that marks are treated by purchasers as an indication that the trade- mark owner is associated with the product." Kentucky Fried ______________ Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 387 _____________ ____________________________ (5th Cir. 1977). Indeed, under trademark law the protection of the mark may be lost if the licensor fails to control the quality _____ of the licensed goods; failure to control the quality of licensed goods can constitute an abrogation of the licensor's duty to protect the informational value of the mark. See Kentucky Fried ___ ______________ 31 testimony of LHP's witnesses, Cheryl Stoebenau and Glen Konkle, need not be considered. Extrinsic evidence may not be utilized to contradict the unambiguous terms of a written agreement. See ___ LTX Corp., 926 F.2d at 1263-64; Triple-A Baseball Club Assoc. v. ___ _____ ________ ________ ____ ______ Northeastern Baseball, Inc., 832 F.2d 214, 221 (1st Cir. 1987), ____________ ________ ____ cert. denied, 485 U.S. 935 (1988). _____ ______ ____________________ Chicken, 549 F.2d at 387; see also Church of Scientology Int'l v. _______ ___ ____ ___________________________ Elmira Mission of Church of Scientology, 794 F.2d 38, 43 (2d Cir. _______________________________________ 1986). LHP argues that the licensor's duty of control is less stringent where the mark is licensed for use in a context unre- lated to the licensor's original business. See Winnebago Indus., ___ _________________ Inc. v. Oliver & Winston, Inc., 207 U.S.P.Q. 335, 340 (T.T.A.B. ____ _______________________ 1980). Whatever its merit as a general matter, however, this proposition is unavailing in the present context: the APA licensed the use of "Curious George" for purposes both related _______ and unrelated to the original (literary) use of the "Curious _________ George" mark, and in no instance does it distinguish between "related" and "unrelated" uses. Similarly, under copyright law, while a licensor has no "moral right" to control the quality of licensed depictions, see ___ Gilliam v. American Broadcasting Cos., 538 F.2d 14, 24 (2d Cir. _______ ___________________________ 1976), she may insist, contractually, on approval provisions to "assure quality control and high standards in the exploitation" of her creative work." See Clifford Ross Co. v. Nelvana, Ltd., ___ _________________ _____________ 710 F. Supp. 517, 520 (S.D.N.Y.), aff'd. without opinion, 883 _______________________ F.2d 1022 (2d Cir. 1989); see also Zim v. Western Pub. Co., 573 ___ ____ ___ _________________ F.2d 1318, 1324 (5th Cir. 1978) (author has "profound interest, both professional and financial, in maintaining the quality of [published products], particularly those already published under [her] name"). Clifford Ross is particularly instructive, as it _____________ too involved a "classic literary property," the "Babar" child- ren's book character. Upholding a contractual provision which called for the copyright holder's participation in the selection of licensing agents for the character, and enjoining the issuance of further licenses absent the holder's approval, the court concluded that there would be "irreparable harm" to the future profitability of "Babar," and to the artistic reputation of the holder, "if the exploitation of Babar continue[d] without regard to [the licensor's] high standards of quality control." Clifford ________ Ross, 710 F. Supp. at 520. Compare Geisel v. Poynter Products, ____ _______ ______ _________________ Inc., 283 F. Supp. 261 (S.D.N.Y. 1968) (issuing injunction under ____ Lanham Act; finding likelihood of "irreparable harm" to author's reputation where "Dr. Seuss" toys, which author found to be "tasteless, unattractive, and of an inferior quality," were marketed as authorized by author). 32 Even though the APA's product approval clause did not preclude Rey from rejecting products based on their "junky" quality, it did obligate her to act "reasonably" in doing so. The duty to act "reasonably," like a duty to employ "best ef- forts," or to act in "good faith," is not reducible to "a fixed formula[, and] varies with the facts and the field of law in- volved." See Triple-A Baseball Club, 832 F.2d at 225 (discussing ___ ______________________ contractual "best efforts" clause); see generally Robert S. ___ _________ Summers, "Good Faith" in General Contract Law and the Sales ______________________________________________________ Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195, ___________________________________________ 201, 204-07 (1968) (discussing "good faith" as "phrase without general meaning," incapable of precise definition). In a some- what different context, the Massachusetts courts have interpreted contractual clauses preventing the "unreasonable withholding of approval" of commercial sublessees, as imposing a duty to act "in accordance with usual standards of reasonableness." See Nassif ___ ______ v. Boston & M. R. Co., 340 Mass. 557, 564, 165 N.E.2d 397, 401-02 __________________ (1966); Worcester-Tatnuck Square CVS, Inc. v. Kaplan, 33 Mass. ___________________________________ ______ App. Ct. 499, 601 N.E.2d 485 (1992). It falls to us to define "usual standards of reasonableness," in the present context, in a way which accords with the contracting parties' intent, yet avoids rendering the "reasonableness" standard either purely illusory or duplicative of more particular contractual terms. We think the APA's proscription of "unreasonable" product disapproval required, at a minimum, that Rey articulate some material reason, subjective or otherwise, for disapproving a ________ 33 product. That is to say, Rey could not withhold product approval without ascribing a reason, nor for reasons immaterial to the "Curious George" mark, its proposed use or commercial potential, or unrelated to Rey's artistic and reputational identification with the mark and ancillary products. Moreover, assuming there existed some material ground for withholding product approval, it would need to be communicated, consistent with contractual speci- fications, "within a reasonable time and in a reasonable manner, i.e., in a manner which makes it possible for [the licensee] to ____ rework the [product] in order to meet . . . approval." See Zim, ___ ___ 573 F.2d at 1324. Finally, the reason for withholding product approval could not be so preclusive as to frustrate the fundamen- _________ tal contractual assumptions on which the APA was formed. In the ___ ___________ ___________ context of this case, for example, Rey could not impose approval standards which would effectively eliminate all potential for profitable use of the "Curious George" property; the parties' mutual assent, in the APA, that Rey would be entitled to minimum royalty payments, plainly implied a mutual understanding that some licensing of the "Curious George" character would be accept- ____ able, in order to enable sales from which royalties might be generated. Cf. Steven J. Burton, Breach of Contract and the ___ ____________________________ Common Law Duty to Perform in Good Faith, 94 Harv. L. Rev. 369, __________________________________________ 403 (1980) ("discretion in performance may be exercised legiti- mately [only] for the purposes reasonably contemplated by the parties"). The district court supportably found that Rey approved 34 "many products," including the original film series, the Houghton Mifflin books, the Sony videocassettes, the first series of DLM software, and the Eden plush toys (as modified). In addition, Rey testified, without contradiction, that she had approved "children's sweatshirts, film strips, earmuffs and school bags for children . . . buttons, children's books . . . paper doll books[,] [w]rist watch, alarm clocks, wall clocks, footwear, little tennis shoes for children, . . . [b]each slippers, . . ." After reviewing the record, we are convinced that Rey did not utilize objectively unreasonable criteria for approving products under the APA. We turn to the particular product rejections challenged on appeal. 1. The Sears Pajamas. 1. The Sears Pajamas. _________________ The district court ruled that Rey acted unreasonably by basing her disapproval of the Sears project on the "junky" quality of the pajama material which would bear "Curious Georg- e's" likeness.11 As we have stated, see supra at pp. 32-34, ___ _____ the basis for the district court's finding of "unreasonableness" was insufficient as a matter of law. Rey did not unreasonably withhold approval of the Sears pajama project as unbefitting the "Curious George" image protected by her copyright, because the grounds for withholding approval were reasonably related to the ____________________ 11The district court did not address the aesthetic reasons Rey gave for rejecting the Sears project, viz., the "bright ____ yellow" color of the pajama material and the unrecognizable "plump" depiction of "Curious George." We believe these grounds were not unreasonable. 35 integrity and commercial value of her artistic creation. See ___ Clifford Ross, 710 F. Supp. at 520.12 _____________ 2. The Beach Paper Products. 2. The Beach Paper Products. ________________________ Our conclusion that Rey reasonably rejected the Sears project disposes of LHP's claim for damages relating to the Beach paper products as well. Rey never saw, much less "disapproved," the Beach paper products: as the undisputed evidence shows, Beach withdrew its proposal when the Sears project fell through; it never reached agreement with LHP or presented any product to Rey for approval. Therefore, LHP's claimed right to recover potential profits from the Beach project could be justified, if at all, only as consequential damages resulting from a wrongful _____________ _______ rejection of the Sears project. As the Sears project was not wrongfully rejected under the terms of the APA, LHP is not entitled to consequential damages related to Beach's anticipated ____________________ 12LHP nonetheless maintains that Rey's rejection of the Sears pajama project was "unreasonable," insofar as it was not communicated in a manner which "ma[de] it possible . . . to rework the [product] in order to obtain . . . approval." Zim, ___ 573 F.2d at 1324. LHP argues that time pressures inherent in the Sears catalog deadlines made the presentation of the pajamas a "one-shot deal," with "reworking" of the design impossible once rejection had occurred. It insists that the "lousy material" in the pajamas a basis for Rey's disapproval was required by federal fire safety standards; no other material was available for use in the product. Even assuming these fact-based arguments are well founded, however an assessment we are in no position to make on the present record they are beside the point: the APA's "reason- ableness" constraint did not oblige Rey to apply lower standards, or to relax her vigilance in policing ancillary uses for the "Curious George" character, merely because deadlines were tight or objections to the product could not be cured. See APA at p. 3 _____ ___ ___ ("if you disapprove of any product, you will, if feasible, __ ________ suggest such changes to [LHP] as may render the product accept- able to you") (emphasis added). 36 profits. See, e.g., Ryan v. Royal Ins. Co., 916 F.2d 731, 744 ___ ____ ____ ______________ (1st Cir. 1990) ("unless appellants can demonstrate that [appel- lee] breached a duty owed to them. . . . consequential damages will not lie"). 3. The Eden Plush Toys. 3. The Eden Plush Toys. ___________________ The district court ruled that Rey acted unreasonably with respect to the Eden plush toys project, but the court did not state whether its ruling was based on Rey's objections to the "junky" nature of the proposed product, or some other ground. We conclude, nonetheless, that remand is unnecessary in the present circumstances, see Produits Nestle, 982 F.2d at 640-41 ("when a ___ _______________ trial court misperceives and misapplies the law, remand may or may not be essential"), since LHP did not present sufficient evidence to enable a finding that Rey's actions with respect to Eden were "unreasonable." See id. at 642 (quoting Dedham Water ___ ___ ____________ Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 463 (1st Cir. ___ ____________________________ 1992)). Applying the standard articulated supra pp. 33-34, _____ "reasonableness" in the present context turns, first, on whether the reasons for rejecting a proposed product were "material." As recently noted by the court, "[t]here is no mechanical way to determine the point at which a difference becomes 'material.' Separating wheat from chaff must be done on a case-by-case basis." Produits Nestle, 982 F.2d at 641. In reference to _______________ conventional commercial products, such as the Perugina chocolates licensed in Produits Nestle, the appropriate test is whether the _______________ ground for refusing to approve a version of a licensed product is 37 one which "consumers would likely consider relevant." Id. In ___ the context of an artistic creation such as "Curious George," however, the highly subjective element of "creativity," connect- ing product and author, implicates intangible considerations such as the "total concept and feel" of the product. See Roth Greet- ___ ___________ ing Cards v. United Card Co., 429 F.2d 1106 (9th Cir. 1970); see _________ _______________ ___ also Sid & Marty Krofft Television Productions, Inc. v. McDonalds ____ _______________________________________________ _________ Corp., 562 F.2d 1157 (9th Cir. 1977). We believe an author's _____ discretionary right to disapprove an ancillary product, as not in keeping with the aesthetic image the author envisions for her artistic creation, reasonably may be made to depend on product conformity, at least where, as here, conformity with the author's aesthetic standard would neither set unreasonably high levels of commercial practicality nor foreclose all prospect of profit- ________ ability on which the contract was predicated. See supra at pp. ___ _____ 33-34. The evidence before the district court clearly showed that Rey imposed a demanding aesthetic standard for the design of the Eden Toys doll.13 Eden's frustration at Rey's meticulous immersion in the details of toy design may indeed be understand- able, the more so perhaps because of the irascible terms in which Rey appears to have chosen to couch her product criticisms on occasion. Even viewing the evidence as a whole in the light most ____________________ 13For example, she relocated the felt patterns on "Curious George's" face by a few millimeters and rejected particular colors and color combinations which Eden thought would make the doll more saleable. 38 flattering to LHP, however, we cannot conclude that her proposed changes were unrelated to her legitimate artistic concerns or to her desire to protect the aesthetic integrity of the "Curious George" image. "Reasonableness" likewise requires, of course, that changes be made "within a reasonable time and in a reasonable manner, i.e., in a manner which makes it possible for [the licen- ____ see] to rework the [product] in order to meet . . . approval." See Zim, 573 F.2d at 1324. The evidence before the district ___ ___ court, which we have examined in detail, did not show that Rey's product criticisms, though caustic, were made in an unreasonable time or manner. And although the record is replete with testimo- ny that Eden and LHP grumbled about Rey's product criticisms, neither Eden nor LHP ever communicated to Rey, prior to the __ ___ present lawsuit, that her proposed changes to the Eden plush toy products were impracticable or even unduly burdensome.14 Since Rey's objections to Eden's original toy design were based on criteria reasonably related to her legitimate artistic and aesthetic concerns about the proposed ancillary product, and were communicated in a time and manner which would permit Eden to conform the product, we conclude that Rey's rejection of Eden's product designs was not "unreasonable." ____________________ 14For example, the President of Eden Toys testified: "[W]hat we tried to do, therefore, was to get very specific, and say: If you want it moved three millimeters to the left, we'll _____ move it, but let's all agree on that's where it's going to be . . ____ __ . ." (Emphasis added.) 39 4. The DLM Software. 4. The DLM Software. ________________ Finally, we consider whether Rey's alleged rudeness to Donna Craighead, the DLM project manager, amounted to an "unrea- sonable withholding of approval" of the DLM software project in violation of the APA. We conclude that it did not. As all parties agree, the licensing arrangement between DLM and LHP covered only the first installment in the proposed DLM software trilogy, the first installment was approved by Rey prior to her ________ telephone conversation with Craighead, and DLM continued to manufacture and market the first-installment software even after Rey's intemperate remarks. Given the fact that Rey's statements led to no curtailment in the production or sale of the licensed software, we are unable to discern any relevant respect in which Rey's statements to Craighead could be considered a "rejection" of the product for which LHP had issued its license to DLM. The district court apparently thought that Rey's harsh criticism of the first software installment may have discouraged DLM from undertaking "second and . . . later" installments in the proposed trilogy. Here, however, the relevant consideration is that these subsequent installments had not yet been licensed by ___ ___ ___ ____ ________ the time Rey communicated her criticism about the first software _____ product and manual. Even were Rey's criticism actionable in tort, as an "intentional interference with contractual rela- tions," see Restatement (Second) of Torts 766, or as a breach ___ of the implied good-faith duty not to interfere with LHP's per- formance under the APA, it nevertheless was not actionable in 40 contract. Under the plain terms of the APA, Rey could not "reject" products not yet licensed or presented for approval.15 LHP attempts to extend the APA's plain language by characterizing Rey's criticism of the DLM project as "essentially revok[ing] product approval [of] the DLM software concept" __________ _______ already approved by Rey. LHP does not define the term "software concept," but clearly uses it to encompass not only the first DLM product but all subsequent installments in the planned trilogy. Such an interpretation would not withstand analysis under the language of the APA, however, nor comport with the undisputed record evidence. We reject LHP's overly expansive definition of "prod- uct" in the present context. By lumping all DLM software prod- ucts under the umbrella of a single software "concept," LHP would eviscerate Rey's retained right to grant, or reasonably withhold, approval for distinct generations of software products in a particular software series. All conceptually related articles ____________ identified by LHP as part of the same series would be deemed approved, sight unseen; the policing of the integrity of the conceptual relationship presumably having ceased to be a matter of legitimate concern to Rey. Courts universally recognize that the elasticity of contract language is limited by the natural meaning of its terms and their context. See K Mart, 892 F.2d at ___ ______ ____________________ 15The district court ruled that the tort claims arising out of "most of" Rey's conduct were time-barred. LHP does not challenge this ruling. See supra n.9 and accompanying text. ___ _____ 41 1085; Boston Edison Corp., 856 F.2d at 365. LHP's interpretation ___________________ strips the "product approval" term from its context and depletes its natural meaning. CONCLUSION CONCLUSION __________ Under the APA, Rey is entitled to recover the royalties wrongly withheld on the Houghton Mifflin books and Sony videos; and we affirm the district court rulings respecting these claims. The APA likewise entitled Rey to withhold approval of licensed ancillary products on reasonable grounds; thus, LHP was not entitled to recover damages for Rey's reasonable exercise of her right to withhold approval of the Sears pajama project, the Beach paper products, the Eden Toys project, or the DLM software.16 Accordingly, the damages awards to LHP are vacated. Affirmed in part, reversed in part; costs are awarded _______________________________________________________ to Rey. ______ ____________________ 16We have considered all other arguments advanced by the parties and find them either to be wanting or, alternatively, moot. Without limiting the generality of the foregoing, we note that, because we conclude that Rey reasonably withheld approval of the Sears project, the Eden plush toys, and the DLM software, we need not consider whether LHP's estimates of lost future profits from these products were sufficiently certain and non- speculative to support an award of damages. See, e.g., Hendricks ___ ____ _________ & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 217 (1st Cir. ________________ _____________ 1991) (citing John Hetherington & Sons, 210 Mass. 8, 21, 95 N.E. ________________________ 961 (1911)); Redgrave v. Boston Symphony Orchestra, Inc., 855 ________ ________________________________ F.2d 888, 893 (1st Cir.), cert. denied, 488 U.S. 1043 (1988). _____ ______ Nor need we consider whether the damages awarded LHP for these products should have been reduced by 50%, reflecting Rey's share ___ of product royalties under the pre-1988 APA formula, or by 33%, under the revised APA formula for products licensed after January 1, 1988. 42